RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0104p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARIE MODERWELL, Administrator of the Estate of
Larry C. Johnson, deceased,

*Plaintiff-Appellee*,

*v.*

CUYAHOGA COUNTY, OHIO, et al.,

*Defendants*,

ARMOND D. BUDISH; CLIFFORD PINKNEY; GEORGE
TAYLOR; BRANDY CARNEY; JOSEPH JOHNSTON;
RONALD CHANNELL; ANTER MILLER; KURT EMERSON,

*Defendants-Appellants*.

No. 20-3879

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cv-00613—Christopher A. Boyko, District Judge.

Decided and Filed:  May 12, 2021

Before:  COLE, CLAY, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Brendan D. Healy, CUYAHOGA COUNTY PROSECUTOR'S OFFICE,
Cleveland, Ohio, for Appellants.  Meaghan VerGow, Ashley Robertson, O'MELVENY &
MYERS LLP, Washington, D.C., Steven J. Olson, O'MELVENY & MYERS LLP, Los Angeles,
California, Thomas D. Robenalt, ROBENALT LAW FIRM, Westlake, Ohio, Samuel Weiss,
RIGHTS BEHIND BARS, Washington, D.C., for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge.   On June 29, 2018, Larry Johnson, a pretrial detainee at the Cuyahoga County Correctional Center ("CCCC"), hanged himself.   Marie Moderwell, the administrator of Johnson's estate, filed this 42 U.S.C. § 1983 suit against twenty-one defendants. After answering the Amended Complaint, four CCCC correctional officers moved the district court for partial judgment on the pleadings and four Cuyahoga County officials moved for judgment on the pleadings.   The district court granted in part and denied in part the motions, and Defendants appealed.   For the reasons set forth below, we **AFFIRM** the district court's decision.

**BACKGROUND**

**A.  Factual Background**

In January 2015, Defendant Armond Budish became the Cuyahoga County Executive. To increase revenue for the County, Budish developed a plan for the "regionalization" of the County's jails.  (R. 55 at PageID# 294.)  In essence, the regionalization plan called for CCCC to house detainees and prisoners from nearby communities in exchange for significant sums of money.

However, CCCC was already severely overcrowded and understaffed.  For example, even before the regionalization plan began, the CCCC nursing director, Marcus Harris, complained that inmates were "not being given critical healthcare and that one nurse was doing as many as 100 intake assessments a day." (*Id.*)  When no action was taken in response to his complaints, Harris resigned. Around the same time, the union representing the CCCC correctional officers "complained to the County that there were serious staffing level problems and health and safety problems at" CCCC.  (*Id.* at PageID## 294–95.)

Nonetheless, in March 2018, the first stage of regionalization began with the transfer of City of Cleveland inmates and detainees to CCCC.  By May 22, 2018, the Cuyahoga County Council agreed that the issues at CCCC, including the understaffing, were "mission critical."

(*Id.* at PageID# 295.)  At the Council meeting, Gary Brack, a former CCCC medical supervisor, informed the Council that CCCC had a "nursing crisis."  (*Id.*)  Brack informed the Council that Budish fired him after his many requests for more nurses were denied.  After the meeting, Council members sent a letter to Budish stating that the situation at CCCC was "a life-or-death issue." (*Id.* at PageID# 296.) Budish took no action in response to the letter.  Even after a CCCC inmate, Theodore Carter, died on June 10, 2018, from a lack of medical care, the situation at CCCC was not addressed.

On June 20, 2018, Johnson was detained at CCCC while awaiting trial on allegations of petty theft.  During his intake assessment, a nurse noted that he was "likely a suicide risk because he had attempted to harm himself in the past."  (*Id.* at PageID# 297.)  Allegedly due to a custom or policy of ignoring such medical conditions, no protective action or treatment was taken in response.  Three days later, Johnson told a nurse that he was "suicidal."  (*Id.*)  Again, no action was taken in response.  Defendants Joseph Johnston, Ronald Channell, Anter Miller, and Kurt Emerson, all CCCC correctional officers ("Corrections Defendants"), were aware that Johnson was a suicide risk.

On June 29, 2018, Johnson was caught allegedly trying to steal food from the CCCC commissary.  According to Plaintiff, Warden Eric Ivey was "known to deprive food to inmates and that is likely what caused Larry Johnson to try and steal food."[1]  (*Id.* at PageID# 297.)  Despite knowing that he was a suicide risk, the Corrections Defendants placed Johnson in solitary confinement.  He did not receive an assessment or medical treatment, and no one checked in on him.  Late that evening, Johnson was found hanging in the cell.  Because CCCC lacked a device with which to cut him down, Johnson was left hanging even after he was discovered.  On July 1, 2018, Johnson died from his injuries.

Shortly after Johnson's death, the United States Department of Justice conducted a review of CCCC.  *See* Dep't of Justice, *U.S. Marshal, Quality Assurance Review: Cuyahoga County Correctional Center* (Oct. 30-Nov. 1, 2018), https://tinyurl.com/y7gcmzc4 ("DOJ

---

[1]Ivey is a defendant in the case below but is not part of this appeal.

Report").**2**  The subsequent report detailed the appalling conditions at CCCC.  When it came to ensuring "safe, secure, and humane confinement," CCCC's "overall facility operation received a rating of 'Unsatisfactory/At-Risk.'"  DOJ Report at 3.

Among many issues at CCCC, the report highlighted the facility's "inadequate medical program."  *Id.* at 4.  For example, numerous members of the medical staff lacked proper licenses, comprehensive mental health appraisals were not conducted in a timely manner, and there was no mental health nurse practitioner.  *See id.* at 30–33.  Additionally, CCCC correctional officers received only eight hours of annual training, which included no training on medical emergency procedures or on the supervision of detainees.  *See id.* at 28.  The report also discussed "[t]he intentional and deliberate use of food as a punitive measure."  *Id.* at 4.

Moreover, CCCC housed 2,420 inmates and detainees even though its capacity was only 1,765, and there were 96 correctional officer vacancies.  *See id.* at 6.  The overcrowding was so severe that residents, including two pregnant women, were observed sleeping on mattresses on the floor.  *See id.* at 5.  And according to the Cuyahoga County Court of Common Pleas, "shortage of staffing in the jail contributes to a lack of identification of people who need medical and psychiatric care upon booking."  (R. 55 at PageID# 299.)

The report also documented "CCCC's implementation of a lockdown system known as 'Red Zone,'" and its use "as a means to address insufficient staff and staffing shortages."  DOJ Report at 4.  According to the report, detainees in the Red Zone "are locked down for periods of 27 or more hours in their cells," are denied access to necessities including toilet paper, and CCCC refused to "install shower curtains for detainees/inmates housed in the 'Red Zone.'"  *Id.* Detainees in the Red Zone do not receive a daily visit from medical staff.  *See id.* at 41.  At the time of Johnson's detention, there was also no schedule for observing detainees in the Red Zone. *See id.* at 42.

---

**2**By extensively relying on, and quoting from, the DOJ Report, the Amended Complaint adopted the DOJ Report by reference, and we may properly consider its contents.  *See Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); Fed. R. Civ. P. 10(c).  Although Defendants do not challenge Plaintiff's reliance on the DOJ Report, they do argue that Plaintiff's references to four news articles should be stricken.  Because these news articles were not included in the pleadings, we do not consider this outside evidence. *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483–84 (6th Cir. 2020).

The conditions at CCCC, both before and after regionalization, had severe consequences. Between June and October 2016, a period prior to the implementation of the regionalization plan, six people housed at CCCC died. *See id.* at 33. One death was confirmed a suicide, but because CCCC failed to conduct mortality reviews, the cause of death for the other five is unknown.[3] *See id.* at 33. In the year prior to the DOJ's review, a period that includes the implementation of the regionalization plan, the report detailed 55 suicide attempts at CCCC, and three completed suicides, including Johnson's. *See id.* at 25. In the eight months between Johnson's death and the initiation of this action, at least six more CCCC residents died from injuries sustained at CCCC.

**B. Procedural Background**

On March 19, 2019, Moderwell filed suit in the district court under 42 U.S.C. § 1983. Two groups of defendants are relevant to the present appeal: 1) the Corrections Defendants; and (2) Budish; Clifford Pinkney, the Cuyahoga County Sheriff; George Taylor, who was Pinkney's immediate assistant; and Brandy Carney, the Cuyahoga County Chief Safety Protection Officer ("Executive Defendants").

On January 14, 2020, the Corrections Defendants moved the district court for partial judgment on the pleadings in their favor and the Executive Defendants moved the district court for judgment on the pleadings in their favor. The district court granted in part and denied in part both motions. *See Moderwell v. Cuyahoga County*, No. 19-613, 2020 WL 4726458, at *1 (N.D. Ohio Aug. 14, 2020); *Moderwell v. Cuyahoga County*, No. 19-613, 2020 WL 4726456, at *1 (N.D. Ohio Aug. 14, 2020). As to Plaintiff's claims under both the Eighth Amendment and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the district court granted judgment to both the Corrections and Executive Defendants. *See Moderwell*, 2020 WL 4726458, at *2–3; *Moderwell*, 2020 WL 4726456, at *2–3. The district court also dismissed Plaintiff's excessive force claim against the Executive Defendants. *See Moderwell*, 2020 WL 4726456, at *4.

However, the district court concluded that Plaintiff "sufficiently alleged a § 1983 claim of excessive force as against the Correction[s] Defendants," *Moderwell*, 2020 WL 4726458, at *4,

---

[3]Ivey has since pleaded guilty to obstructing justice by deleting video surveillance of inmate deaths.

and "sufficiently alleged a § 1983 claim of deliberate indifference to serious medical needs" and "set forth a plausible Supervisory Liability Claim" against the Executive Defendants, *Moderwell*, 2020 WL 4726456, at *5–6. Recognizing that this Court has cautioned against dismissing a case on qualified immunity grounds based only on the pleadings, the district court also held that dismissal of these claims based on qualified immunity "is improper at this juncture." *Moderwell*, 2020 WL 4726458, at *4; *Moderwell*, 2020 WL 4726456, at *6.

This timely appeal followed.[4]

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed--but early enough not to delay trial--a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "We review *de novo* a judgment on the pleadings granted pursuant to Rule 12(c) . . . using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6)." *Moore, Successor Tr. of Clarence M. Moore & Laura P. Moore Tr. v. Hiram Twp.*, 988 F.3d 353, 357 (6th Cir. 2021) (citing *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389 (6th Cir. 2007)).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)). "But we 'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)). "A Rule 12(c) motion 'is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Id.* (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

---

[4]Although this Court typically only has jurisdiction over "final decisions of the district courts," 28 U.S.C. § 1291, "[u]nder the collateral-order doctrine a limited set of district-court orders are reviewable 'though short of final judgment,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). And it "is well established" that a "district court's order rejecting qualified immunity . . . is a 'final decision' within the meaning of § 1291." *Id.* at 672.

In order to overcome a defendant's qualified immunity defense, "a plaintiff must plausibly allege facts showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (cleaned up). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (quoting *Anderson*, 483 U.S. at 641). But "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* at 590 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Hart v. Hillsdale County*, 973 F.3d 627, 641 (6th Cir. 2020). Thus, when "no reasonable correctional officer could have concluded" that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point. *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020); *see also* Joanna C. Schwartz, *Qualified Immunity and Federalism All the Way Down*, 109 Geo. L.J. 305, 351 (2020) ("The Court's decision in *Taylor* sends the signal to lower courts that they can deny qualified immunity without a prior case on point."); Lawrence Rosenthal, *Defending Qualified Immunity*, 72 S.C. L. Rev. 547, 593 & n.193 (2020) ("More recently, however, the

Court has stressed that on egregious facts, qualified immunity should be denied regardless whether there are factually similar precedents.").

Although a defendant's "entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (cleaned up). "The reasoning for our general preference is straightforward: 'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)). Therefore, "it is generally inappropriate for a . . . court to grant a [12(c) motion for judgment on the pleadings] on the basis of qualified immunity." *Wesley*, 779 F.3d at 433.

### I. Corrections Defendants

At the outset, it is necessary to clarify the constitutional claim at issue. In the Corrections Defendants' motion for partial judgment on the pleadings, they interpreted the Amended Complaint to "allege violations of [Johnson's] Eighth and Fourteenth Amendment rights under the following theories: (1) supervisory liability; (2) deliberate indifference to serious medical need; . . . (3) excessive use of force," and (4) *Monell* liability. (R. 76-1 at PageID# 581.) The Corrections Defendants sought judgment only on "Plaintiff's excessive force, Eighth Amendment, and *Monell* claims against the Corrections Defendants in their individual capacities," (*Id.* at PageID# 582), and the district court granted the Corrections Defendants' motion except as to the Fourteenth Amendment excessive force claims, *see Moderwell*, 2020 WL 4726458, at *4.

On appeal, Plaintiff relies heavily on *Bell v. Wolfish*, 441 U.S. 520 (1979), and *J.H. v. Williamson County*, 951 F.3d 709 (6th Cir. 2020), to support her excessive force claims against the Corrections Defendants. But, as the Corrections Defendants argue, those cases concern

conditions of confinement claims—not excessive force claims.[5]  *See Bell*, 441 U.S. at 535; *J.H.*, 951 F.3d at 715–717.  Although the Corrections Defendants preserved their challenge to Plaintiff's excessive force claims in the proceedings below, as they recognize, they did not preserve a challenge to any conditions of confinement claims that Plaintiff may have brought.  *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331–32 (6th Cir. 2009).  Therefore, we only analyze whether the Corrections Defendants are entitled to judgment on the pleadings on the excessive force claims and do not address Plaintiff's arguments based on *Bell* and *J.H.*

"To prevail on an excessive force claim, a pretrial detainee must show 'that the force purposely or knowingly used against him was objectively unreasonable.'"  *Cretacci v. Call*, 988 F.3d 860, 869 (6th Cir. 2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).  Whether force used against a pretrial detainee is objectively unreasonable "turns on the 'facts and circumstances of each particular case'" as viewed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time."  *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Although the factual record is currently wholly undeveloped, the Corrections Defendants nonetheless argue that they are "entitled to qualified immunity because they did not violate a clearly established constitutional right under the Fourteenth Amendment."  (Appellant Br. at 12.)  According to the Corrections Defendants, there is no need to develop the factual record in this case because the Amended Complaint did not allege an assault against Johnson, and, as a matter of law, claims of excessive force require that the pretrial detainee be assaulted.

However, this Court has held that "'claims of excessive force do not necessarily require allegations of assault,' but rather can consist of the physical structure and conditions of the place of detention."  *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002) (quoting *Cornwell v.*

---

[5]The Corrections Defendants further assert that the Amended Complaint fails to state a conditions of confinement claim.  However, in the first cause of action, which, in part, alleges a failure to "Take Corrective Measures Causing Constitutional Violations of the Eighth and Fourteenth Amendments," the Amended Complaint charges the defendants with the "[f]ailure and/or refusal to provide adequate monitoring and housing for detainees who present risk of serious physical and/or mental harm and death," and with "[f]ailing and/or refusing to provide adequate housing and properly classify detainees so that they will have timely and adequate access to and delivery of necessary and indicated medical and mental health assessment, evaluation, care, intervention, referral, and treatment."  (R. 55 at PageID## 304–06.)

*Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992)); *see also Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999). For example, in *Cornwell*, a large group of inmates "intended to protest [a] new prison policy by staging a sit-in on the bleachers" of an outdoor recreation area. 963 F.2d at 914. In response, those inmates "were rounded up" and "forced to lie face-down with their eyes closed in a cold, muddy area." *Id.* On a subsequent Fourth Amendment claim, this Court explained that "claims of excessive force do not necessarily require allegations of assault." *Id.* at 915 (citing *Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990)). Therefore, Plaintiff's claims of excessive force based on the Corrections Defendants subjecting Johnson to the horrible conditions of CCCC's Red Zone, despite his suicidal condition and in response to a non-violent minor infraction, are not categorically barred by the Amended Complaint's failure to allege that the Corrections Defendants assaulted Johnson.

Because it was unnecessary for Plaintiff to allege an assault in conjunction with her excessive force claim, there is no reason to depart from "our general preference" not to grant qualified immunity based only on the pleadings. *Guertin*, 912 F.3d at 917. To understand "the 'facts and circumstances of [this] particular case,'" and to decide whether, faced with those facts and circumstances, a reasonable official would have understood that placing Johnson in CCCC's Red Zone constituted objectively unreasonable force, Plaintiff must be provided the opportunity to develop the factual record. *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396). Although there is limited precedent addressing claims of excessive force without an assault, at this stage, we cannot determine whether discovery will nonetheless establish that the Corrections Defendants' actions were so "egregious" that "any reasonable officer should have realized that" the force used against Johnson "offended the Constitution." *Taylor*, 141 S. Ct. at 54. For example, in *Linden v. Washtenaw County*, 167 F. App'x 410 (6th Cir. 2006), a correctional officer admitted during a deposition to having been warned about the risks of placing a suicidal detainee in solitary confinement. *See id.* at 425–26. Other potentially relevant information that can be unearthed during discovery that might show that "any reasonable officer should have realized that" the force used against Johnson "offended the Constitution," *Taylor*, 141 S. Ct. at 54, includes whether the Corrections Defendants knew about other suicides in the Red Zone, were aware of the allegedly abhorrent "physical structure and conditions" of the Red Zone,

*Burchett*, 310 F.3d at 946, or had some other basis to know the risk that the Red Zone posed to Johnson.

This Court's usual practice of waiting until summary judgment to resolve qualified immunity issues has particular import in this case for another reason. In addition to shielding government officials from liability for civil damages, qualified immunity is also "a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Iqbal*, 556 U.S. at 672 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The desire to shield government officials from "broad discovery," *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015), is the basis for such a defendant's entitlement to have qualified immunity "resolved at the earliest possible point," *Wesley*, 779 F.3d at 433 (quoting *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003)). But this "concern [is] irrelevant here." *Id.* at 434. Because Plaintiff's deliberate indifference claims against the Corrections Defendants rely on the same factual predicate as the excessive force claims, denying qualified immunity at this stage will not impose any additional discovery burdens. Accordingly, we affirm the district court's decision to allow Plaintiff's excessive force claims against the Corrections Defendants to proceed to discovery.

**II. Executive Defendants**

The "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (cleaned up). And "[t]he Eighth Amendment protection against deliberate indifference extends to pretrial detainees in state prisons by operation of the Due Process Clause of the Fourteenth Amendment." *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014); *see also Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018). The Executive Defendants make several arguments in favor of granting judgment on the pleadings as to Plaintiff's deliberate indifference claims against them, but all would require us to ignore the posture of this appeal.[6]

---

[6]Because none of the Executive Defendants' arguments implicate the deliberate indifference standard, we need not decide whether, pursuant to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the test for deliberate indifference claims brought under the Fourteenth Amendment retains a subjective component. *See Griffith v. Franklin County*, 975 F.3d 554, 570 (6th Cir. 2020) (declining to address this issue because the claim failed whether

First, the Executive Defendants argue that the Amended Complaint insufficiently stated allegations against them because, in most of the relevant allegations, the Amended Complaint lists Budish, Pinkney, Taylor, and Carney (and various others) together without providing distinct allegations for each defendant. However, the Amended Complaint alleges that, acting in concert, the four high-level executives with "final policymaking authority over policies, practices, and customs of the CCCC" violated Johnson's constitutional rights. (R. 55 at PageID## 279, 280, 282.) At summary judgment, Plaintiff will have to muster "facts that demonstrate what *each* defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)). But, at the pleading stage, Plaintiff's allegations are enough. *See Hart*, 973 F.3d at 640 (describing the difficulty of assigning individual liability at the pleading stage).

The Executive Defendants also argue that the district court erroneously held that they could be liable for deliberate indifference because they "could have perceived a risk to any detainee." (Appellant Br. at 21.) According to the Executive Defendants, Plaintiff "must also plead facts showing that the Executive Defendants perceived a risk of harm to Mr. Johnson" specifically. (*Id.*) However, the Supreme Court has made "it clear that the correct inquiry is whether [the defendant] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be." *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Next, the Executive Defendants rely on the principle that "a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). To overcome this obstacle, Plaintiff argues that the Executive Defendants: 1) personally

---

or not there was a subjective component); *see also id.* at 588–89 (Clay, J., concurring in part and dissenting part) (concluding "that *Kingsley* is applicable to the deliberate indifference context" and, accordingly, "that a pretrial detainee must only prove that a defendant-official acted intentionally to ignore their serious medical need or recklessly failed to act with reasonable care to mitigate the risk that the serious medical need posed to the pretrial detainee, even though a reasonable official in the defendant's position would have known, or should have known, that the serious medical need posed an excessive risk to the pretrial detainee's health or safety.").

devised and implemented the regionalization plan—an unconstitutional policy that created an unreasonable risk of suicide, *see Taylor*, 69 F.3d at 81 (stating that a supervisor can be held liable for the "implement[ation of] an unconstitutional policy" (citation omitted)); 2) knowingly acquiesced in unconstitutional policies, including the use of solitary confinement as a punishment for minor infractions, the conditions of the Red Zone, and the denial of food as a punishment, *see Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) ("[S]upervisor liability under § 1983 is appropriate when the supervisor . . . knowingly acquiesced in the unconstitutional conduct of the offending subordinate." (internal quotations and citations omitted)); and 3) abandoned their duties by failing to enact policies to prevent suicide, to provide adequate healthcare, to ensure appropriate supervision, and to train CCCC's correctional officers, *see Winkler*, 893 F.3d at 898 (holding that "a supervisor may be liable under § 1983 if he abandons the specific duties of his position in the face of actual knowledge of a breakdown in the proper workings of the department." (cleaned up)).

As to whether they knowingly acquiesced in the unconstitutional conduct of a subordinate, the Executive Defendants argue that Warden Ivey acted unconstitutionally without their knowledge. However, the Executive Defendants' involvement in, and knowledge of, Ivey's unconstitutional conduct requires "facts to be fleshed out during discovery." *Guertin*, 912 F.3d at 927. Drawing all inferences in Plaintiff's favor, the Amended Complaint alleges that, in response to the severe overcrowding knowingly caused by the Executive Defendants, Ivey implemented unconstitutional policies. The Amended Complaint further alleges that the Executive Defendants were on notice of the "insufficient and inedible food" and the "life-or-death" conditions at CCCC. (R. 55 at PageID## 293, 295–296.) They also allegedly "knew of a custom, propensity, and pattern" of prison officials "failing and/or refusing to provide prompt and competent access to and delivery of medical and mental health assessment, evaluation, care, intervention, referral, and treatment, to detainees." (*Id.* at PageID## 304–05.) At summary judgment, Plaintiff's burden will be to present facts showing that the Executive Defendants knew about the unconstitutional conduct and "did more than play a passive role in the alleged violations or show mere tacit approval of the goings on." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *Peatross*, 818 F.3d at 243. But this burden is not on Plaintiff at the pleading stage. *See Hart*, 973 F.3d at 638 n.4 (explaining that "[a] complaint need not set down

in detail all the particularities of a plaintiff's claim against the defendant." (quoting *Dunn v. Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982))).

Similarly, the Executive Defendants challenge Plaintiff's assertion that they "abandoned the specific duties of their positions in the face of actual knowledge of a breakdown in the proper workings of the [CCCC]," *Winkler*, 893 F.3d at 898 (cleaned up). However, the Amended Complaint alleges that the Executive Defendants were "responsible for . . . the care and treatment of Detainees/Inmates in custody" at CCCC. (R. 55 at PageID# 293.) Moreover, even before the implementation of the regionalization plan, the Executive Defendants knew about the overcrowding, insufficient medical care, staffing shortage, and numerous detainee deaths and suicides at CCCC. Nonetheless, the Executive Defendants implemented a plan that they knew would exacerbate those problems without mitigating the attendant risks. Unsurprisingly, the overcrowding worsened. The already understaffed (and undertrained) CCCC correctional officers and medical team became even more understaffed. And no policies were enacted to lower suicide rates or to improve healthcare. In fact, the Executive Defendants allegedly had a "custom, policy, or practice" of ignoring health risks to suicidal detainees. (*Id.* at PageID# 290.) These allegations are enough to survive the pleading stage. *See Winkler*, 893 F.3d at 899 (explaining that summary judgment was appropriate in a case where the plaintiff contended that the defendant "exhibited deliberate indifference by failing to promulgate additional or alternative policies at the Detention Center" because she failed to show that the defendant "allowed the jail to operate with the knowledge that existing healthcare policies were exposing inmates to a substantial risk of serious harm"); *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020) (affirming a denial of qualified immunity because the plaintiff did "not allege that [the defendant] *knew* the policy was not working and nonetheless completely abdicated his responsibilities").

Finally, the Executive Defendants argue that, assuming the sufficiency of Plaintiff's allegations, they did not violate any clearly established law. However, "ample case law teaches that deliberate indifference toward a detainee's suicidal tendencies is a violation of Constitutional rights." *Linden*, 167 F. App'x at 425. "At the time of this incident, . . . [Johnson] had a clearly established right not to be deprived of food." *Clark-Murphy v. Foreback*, 439 F.3d

280, 292 (6th Cir. 2006) (citing *Kent v. Johnson*, 821 F.2d 1220, 1229 (6th Cir. 1987) (Krupansky, J., concurring in part and dissenting in part)).  He also had a clearly established right to not be housed in an overcrowded facility.  *See Brown v. Plata*, 563 U.S. 493, 501–02 (2011). Whether this, or other, precedent clearly established a right that was violated by the Executive Defendants requires factual development regarding the exact circumstances faced by the Executive Defendants, what actions they took, what they knew when taking the alleged unconstitutional actions, and with what intent they acted.  *See Guertin*, 912 F.3d at 917. Accordingly, we affirm the district court's decision to deny judgment on the pleadings on Plaintiff's deliberate indifference claims against the Executive Defendants.

**CONCLUSION**

For the reasons stated above, the judgment of the district court is **AFFIRMED**.