RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CONNIE L. REGULI; WENDY HANCOCK,

        *Plaintiffs-Appellants*,

    *v.*

TRACY HETZEL; LORI RUSS; DAVID O'NEIL; CITY OF BRENTWOOD, TENNESSEE; ESTATE OF KIMBERLY HELPER; MARY KATHERINE EVINS,

        *Defendants-Appellees*.

No. 25-5579

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:24-cv-00541—Aleta Arthur Trauger, District Judge.

Argued: March 19, 2026

Decided and Filed: June 16, 2026

Before: GRIFFIN, BUSH, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Larry L. Crain, CRAIN LAW GROUP, Brentwood, Tennessee, for Appellants. Amber L. Barker, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee Tracy Hetzel. Cassandra M. Crane, FARRAR BATES BEREXA, Brentwood, Tennessee, for Appellees Lori Russ, David O'Neil, and City of Brentwood, Tennessee. Aaron Bernard, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees Estate of Kimberly Helper and Mary Katherine Evins. **ON BRIEF:** Larry L. Crain, CRAIN LAW GROUP, Brentwood, Tennessee, for Appellants. Amber L. Barker, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee Tracy Hetzel. Cassandra M. Crane, Grace Patton, FARRAR BATES BEREXA, Brentwood, Tennessee, for Appellees Lori Russ, David O'Neil, and City of Brentwood, Tennessee. Mary Elizabeth McCullohs, Jacobs M. Gilbert, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees Estate of Kimberly Helper and Mary Katherine Evins.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  Connie Reguli, a lawyer and parents' rights activist, helped her client, Wendy Hancock, evade a state-court order that sought to separate Hancock from her child.  So the state prosecuted Reguli and Hancock.  But after juries convicted them, a state appellate court held that the conviction statute didn't cover their conduct.  After the two women walked free, they sued the city, the prosecutors, the police officers, and a state official for conspiracy, malicious prosecution, and other violations in federal court.  The district court dismissed every claim.  Now, Reguli and Hancock appeal the district court's dismissal, contending that it shouldn't have dismissed five of their claims.  We AFFIRM.

**I.**

**A.**

Connie Reguli is a lawyer and a parents' rights activist.  She lives in Brentwood, Tennessee, where she advocates for changes to child-welfare laws.  Reguli has been active in the community for years—she unsuccessfully campaigned to become a state legislator in 2008 and a county judge in 2022, and she has represented many parents in state-custody proceedings as a practicing attorney.  One of these parents was Wendy Hancock, a disabled, single mother in Dekalb County, Tennessee.

In early August 2018, Tennessee's Department of Children's Services (the Department) opened an investigation into Hancock.  The Department had received referrals about Hancock's two minor children, so an investigator traveled to Hancock's home to determine whether Hancock was neglecting or abusing them.  But when the investigator arrived, Hancock refused to speak to her.  And when the investigator left, Hancock fled to her father's house with her twelve-year-old daughter, B.B.  After three days, Hancock took B.B. to a hotel in Lebanon, Tennessee, even though B.B. was supposed to be in school.

Meanwhile, Reguli acted as Hancock's attorney. On August 13, she learned that the Department had filed a removal petition against Hancock in the local juvenile court. And on August 15, she learned that the juvenile court judge had signed an *ex parte* removal order, which granted the Department custody of B.B. So Reguli drove to Lebanon, where she met Hancock and B.B. at the hotel.

The Department searched for B.B., but it couldn't find her. On August 15, it teamed-up with police to issue a "missing and endangered child" alert. This alert reached B.B.'s phone while she sat with Reguli and Hancock in the hotel lobby. When B.B. showed the alert to the adults, they decided to flee from the police by disabling their phones and driving to Reguli's Brentwood home. But B.B. posted on social media before the plaintiffs disabled her phone, so the police used the post to track her approximate location. The police arrived at Reguli's Brentwood home on August 16, where they found Hancock and B.B.

After this fiasco, the state took custody of Hancock's two minor children while Reguli and Hancock fought the removal petition. This battle continued for nine months, until the state returned Hancock's children and dismissed the petition.

**B.**

But during this dispute, the plaintiffs' legal troubles outstripped the underlying custody battle. In September 2018, the Department started working with Brentwood's police department to investigate the plaintiffs' August conduct, given that Reguli and Hancock had fled with B.B. and disabled their phones to avoid complying with the removal order. One of the Department's lawyers, Tracy Hetzel, met with Detective Lori Russ, Captain David O'Neil (Russ's boss), and Assistant District Attorney Mary Katharine Evins to make a plan. The investigation lasted nine months, and each defendant played a role: Hetzel investigated for the Department until October 2018, when she shared her findings with Russ and O'Neil. Then Russ and O'Neil investigated until February 2019, when they shared their findings with the local prosecutors—Evins and District Attorney Kimberly Helper.[1]

---

[1]Helper died in 2023, so the plaintiffs are suing her estate.

This wasn't Reguli's first rodeo.  She'd spent her career fighting the government.  Long before this investigation, she'd publicly criticized each defendant, their departments, or their colleagues.  So the complaint alleges that the defendants "harbored malice" against her, with Hetzel having called Reguli a "criminal" and a "B—CH."  *See* R.1, Compl., PageID 21, 25, 69.

Throughout the investigation, Reguli objected to the government's tactics and scope.  Hetzel obtained records from the hotel and voice messages that Reguli had left.  She didn't tell Reguli about these records, but she shared them with Russ.  Then, Detective Russ obtained a search warrant for Reguli's private Facebook account, allegedly because "Reguli said bad things about her and the Brentwood Police Department" and she "wanted to know what [Reguli] was personally saying about her."  *Id.* at PageID 48.  During the investigation, Reguli contacted Captain O'Neil to complain that Hetzel was "using the criminal process to gain an advantage in civil litigation."  *Id.* at PageID 25.

In July 2019, Detective Russ told Reguli that Reguli and Hancock had been indicted.  So Reguli and Hancock turned themselves in.  Days later, Reguli received a copy of the indictment.  The indictment charged Hancock with the felony of "custodial interference."  And it charged Reguli with two felony counts of "accessory after the fact" and one misdemeanor count of "facilitation of a felony for custodial interference."  So under the indictment's structure, Reguli's fate was tied to Hancock's—if Hancock didn't commit a crime, Reguli didn't either.

The indictment specifically charged Hancock with detaining B.B. with the intent to violate a court order—this was the "custodial interference" charge:

> [Wendy Hancock] . . . did detain [B.B.] within this state with the intent to violate a temporary or permanent judgment or court order regarding the custody or care of the child, in violation of Tennessee Code Annotated 39-13-306 . . . .

R.1-1, Indictment, PageID 79.  Although Hancock's indictment didn't specify any particular subsection of § 39-13-306, it seemed to fit (a)(2).  But the indictment's language didn't match the subsection's precisely:

> [d]etain[ing a] child within this state or remov[ing] the child from this state *after the expiration of the noncustodial natural or adoptive parent or guardian's lawful*

*period of visitation*, with the intent to violate . . . a temporary or permanent judgment or a court order regarding the custody or care of the child.

Tenn. Code Ann. § 39-13-306(a)(2) (2018) (emphasis added).

Indeed, whether Reguli and Hancock had committed a crime under this subsection raised a thorny statutory-interpretation question: Did the italicized portion (which the indictment omitted) modify every word that came before it ("Detain the child within this state or remove the child from this state [BREAK] after the expiration of the noncustodial natural or adoptive parent or guardian's lawful period of visitation")? Or did it only modify the preceding clause ("Detain the child within this state [BREAK] or remove the child from this state after the expiration of the noncustodial natural or adoptive parent or guardian's lawful period of visitation")? In other words, does someone violate the statute whenever they detain a child to evade a court order (Hancock's conduct)? Or only when there's a "lawful period of visitation" involved?

The plaintiffs fought the indictments in separate proceedings with the same judge. Before Hancock's trial, she moved to dismiss the indictment because of its omitted language, but the judge denied the motion. And although Assistant D.A. Evins admitted that she wouldn't present any evidence that Hancock had detained B.B. "after the expiration of [a] lawful period of visitation," the judge modified the pattern jury instructions to omit that language. So the case went to trial, and the jury used the modified instructions to convict Hancock of custodial interference. Hancock received a two-year suspended sentence, and she appealed.

After Hancock's conviction, Reguli tried to postpone her trial until after Hancock's appeal. The judge denied the motion, but Reguli's trial was delayed until April 2022. The spring trial coincided with Reguli's 2022 bid for Williamson County Juvenile Court Judge, which Reguli attributes to an intentional plan to sabotage her campaign. Before the trial began, Hancock's judge recused himself from Reguli's case. Still, the court used the same modified jury instructions, and the jury convicted Reguli. Two months later, the court sentenced her to 30 days' imprisonment and two years' probation. Reguli appealed, and she remained free while her appeal pended.

One year later, the Tennessee Court of Criminal Appeals overturned Hancock's conviction. *State v. Hancock*, 678 S.W.3d 226, 239 (Tenn. Crim. App. 2023). To begin, the court rejected Hancock's argument that the indictment's omission ("after the expiration of the noncustodial parent's lawful period of visitation") rendered the indictment invalid. Looking at the indictment reasonably, the court concluded that the indictment's language put Hancock on notice of the relevant subsection, and therefore intimated the crime's essential elements.

But the court agreed that subsection (a)(2) required the "expiration of a period of lawful visitation" because an alternative reading would make other subsections superfluous, and because its past dicta supported this requirement. This language was a material element of the offense—because the jury instructions omitted that material element, the court found that the jury instructions were erroneous. So it reversed and vacated the conviction. And ten months later, the same court vacated Reguli's conviction too.

Soon after the court overturned Hancock's conviction, the state legislature amended the statute to explicitly prohibit conduct like Hancock's. It modified the definition of custodial interference to omit the "expiration of a period of lawful visitation" requirement, instead making it a crime to "[h]arbor or hide [a] child . . . knowing that the child has been placed in the custody of the department of children's services . . . ." Tenn. Code Ann. § 39-13-306(a)(6) (2023).

**C.**

In 2022, Reguli sued Detective Russ for First Amendment retaliation. She said Russ's testimony at the sentencing hearing revealed that police had searched Reguli's Facebook records to retaliate for Reguli's negative comments about them. The district court dismissed her claims as untimely, and the Sixth Circuit affirmed. *Reguli v. Russ*, 109 F.4th 874, 876 (6th Cir. 2024) (per curiam).

Then Reguli and Hancock initiated this lawsuit, suing six defendants in federal court. Their complaint alleges that the defendants conspired to omit an essential element from the indictment, leading to a taxing prosecution even though the plaintiffs never committed a crime. They brought twelve counts. Right away, five of these claims failed. The district court dismissed the claims that alleged substantive due process violations (Counts IV, V, VI) and

intentional infliction of emotional distress torts (Counts IX, X) against all defendants. Then it granted the prosecutors' motion to dismiss the federal claims against them, and it granted Hetzel's motion to dismiss all claims against her. Months later, the court dismissed the lingering state claims against the prosecutors, citing absolute immunity.

The remaining defendants—Russ, O'Neil, and the city—moved for judgment on the pleadings under Rule 12(c) on all remaining claims. And the district court granted that motion. It granted qualified immunity to Russ and O'Neil, explaining that the officers hadn't violated the Constitution or state law. It also noted that the plaintiffs never cited "clearly established law" suggesting otherwise. And it explained that because the malicious-prosecution claims lacked merit, the *Monell* claim against the city couldn't stand. In all, the court held that "the law provides no recourse against prosecutors and judges acting in their respective prosecutorial and judicial capacities, and the allegations here are simply insufficient to establish that the police officer defendants violated the plaintiffs' constitutional or other rights." R.69, Dist. Ct. Op., PageID 641.

So Reguli and Hancock appealed, focusing their arguments on Counts I (federal malicious prosecution), VII (federal conspiracy), VIII (state malicious prosecution), VI (state conspiracy), and XII (*Monell* claim).

## II.

This Court reviews Rule 12(c) motions de novo, using the same standard as Rule 12(b)(6) motions. *Moderwell v. Cuyahoga County*, 997 F.3d 653, 659 (6th Cir. 2021). Under this standard, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *Jackson v. Pro. Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017)). But we don't need to accept the plaintiffs' "legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

We'll analyze the plaintiffs' claims on appeal by breaking them down into three categories. First, the plaintiffs bring federal and state malicious-prosecution claims against the five individual defendants. Second, they bring federal and state conspiracy claims against the

same five defendants.   And third, they bring a federal *Monell* claim against the City of Brentwood.   In response, the defendants assert two kinds of immunity.   Three defendants (Russ, O'Neil, and Hetzel) assert federal and state qualified immunity.   And the two prosecutor defendants (Helper and Evins) assert federal and state absolute immunity.   We address each argument in turn.[2]

**A.**

The plaintiffs accuse the defendants of malicious prosecution, which they say violated their rights under the federal Fourth Amendment and state-tort law.   These two claims have similar requirements.   For a federal malicious-prosecution claim, the plaintiffs must prove that (1) a criminal prosecution was initiated against them, and the defendants "made, influenced, or participated in the decision to prosecute," (2) the criminal prosecution lacked probable cause, (3) they suffered a "deprivation of liberty" because of the legal proceeding, and (4) the criminal proceeding resolved in their favor.   *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (citation modified).   And for a state malicious-prosecution claim, the plaintiffs must show that "the defendant (1) instituted a proceeding against [the plaintiff] without probable cause, (2) with malice, and (3) that the proceeding terminated in the plaintiff's favor."   *Mynatt v. Nat'l Treasury Emps. Union, Chapter 39*, 669 S.W.3d 741, 746 (Tenn. 2023) (citation modified).

For both claims, the dispute centers around one element—probable cause.   The plaintiffs argue that no one had probable cause to prosecute them because, as it turns out, they didn't commit a crime.   But the defendants point to our "general rule" that a grand jury indictment, "fair upon its face, . . . conclusively determines the existence of probable cause."   *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014) (citation modified).

The defendants made a mistake of law—they read the statute as criminalizing Hancock's conduct, and the trial court agreed, but the appellate court disagreed.   And, in this vein, we've explored the possibility that reasonable legal mistakes can create probable cause.   In *Barrera*, we

---

[2]Having dismissed the federal claims, the district court could've declined supplemental jurisdiction over the state claims. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).   Instead, it dismissed those claims too.   The plaintiffs haven't suggested that the district court abused its discretion in reaching the state claims, so we review the district court's resolution of the state and federal claims on the merits.

explained that "[j]ust as a reasonable mistake of fact does not violate an individual's Fourth Amendment rights, so a reasonable mistake of law does not violate them either." *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021); *see Heien v. North Carolina*, 574 U.S. 54, 62 (2014). And in *Sinclair*, we held that "defendants' mistake of law was not so unreasonable as to preclude probable cause." *Sinclair v. Lauderdale County*, 652 F. App'x 429, 435–36 (6th Cir. 2016). This rule applies even when officials act maliciously, since "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see Barrera*, 12 F.4th at 624. So to determine whether the defendants had probable cause, "[w]e need only decide whether the officers' interpretation sinks to unreasonable." *Barrera*, 12 F.4th at 624.

Here, the defendants' interpretation of the statute was likely reasonable, but we need not answer that question conclusively. The individual defendants receive immunity on other grounds for their roles in the investigation and prosecution of the plaintiffs.

**i.**

Detective Russ and Captain O'Neil are entitled to qualified immunity. A police officer maliciously prosecutes a civilian when his "deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014). Typically, this "involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017). But here, the plaintiffs allege that the officers influenced the prosecution by omitting evidence that would've exonerated them—namely, the lack of a visitation order.

When state police officers properly raise a qualified-immunity defense, "[i]t is the plaintiffs' burden to show that the defendants are not entitled to qualified immunity." *Hopkins v. Nichols*, 37 F.4th 1110, 1114 (6th Cir. 2022). To carry this burden, a plaintiff must prove that "(1) the defendant violated a federal statutory or constitutional right, and (2) the unlawfulness of the defendant's conduct was clearly established at the time." *Guptill v. City of Chattanooga*, 160 F.4th 768, 776 (6th Cir. 2025) (citation modified). We can answer these questions in either order. *Jackson v. City of Cleveland*, 64 F.4th 736, 745 (6th Cir. 2023). And for a rule to be

"clearly established," it must be "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

The officers also assert state qualified immunity, which mirrors the federal version. *Hammond-Beville v. Landis*, 2022 WL 910569, at *5 (6th Cir. Mar. 29, 2022) (citing *Youngblood v. Clepper*, 856 S.W.2d 405, 406–07 (Tenn. Ct. App. 1993)). Under Tennessee law, police officers receive state qualified immunity unless they violated clearly established state-tort law. *See Cawood v. Booth*, 2008 WL 4998408, at *11 (Tenn. Ct. App. Nov. 25, 2008) (citing *Rogers v. Gooding*, 84 F. App'x 473, 475–77 (6th Cir. 2003)).

Here, the plaintiffs haven't shown that Russ and O'Neil violated clearly established law.[3] Indeed, the plaintiffs begin their appellate argument by admitting that "[a]fter a diligent search for case law, it appears that the fabrication of a crime has not been addressed by the Court. Many cases discuss fabricated evidence but not fabricated crimes." Appellant Br. at 3. The plaintiffs allege a novel violation of their rights. When the officers gave their investigation to the prosecutors in February 2019, Tennessee's courts hadn't interpreted the statute. So it wasn't clear whether Reguli and Hancock could violate the statute without violating a visitation order. The plaintiffs correctly state that the officers omitted the absence of a visitation order when handing over their investigation to the prosecutors. But at the time, it wasn't apparent that the lack of a visitation order was material.

And more importantly, even if the lack of a visitation order was material, the plaintiffs don't cite a single case—state or federal—that requires officers to disclose the absence of any arguably material information during an investigation. Instead, as they concede, the plaintiffs only cite cases where officers fabricated evidence, *see Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999), arrested suspects without probable cause, *see Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000), or substantiated arrest warrants without including obviously

---

[3]We emphasize that our decision to resolve the immunity questions on "clearly established" grounds isn't an implicit acknowledgment that the plaintiffs' constitutional rights were violated. Their argument that a law enforcement official or prosecutor could be constitutionally liable for incorrectly interpreting a less-than-clear statute is troubling at best.

exonerating testimony, *see Wesley v. Campbell*, 864 F.3d 433, 439 (6th Cir. 2017).  The officers didn't do any of these things.  So Russ and O'Neil are entitled to qualified immunity.

**ii.**

Hetzel, a lawyer for the Department, also receives qualified immunity.  Again, the plaintiffs fail to cite any case that would've made it clear to Hetzel that her behavior was illegal.  Let's review Hetzel's conduct.  When Hetzel investigated whether Hancock had abused or neglected B.B., she discovered that Reguli and Hancock had fled police to keep B.B. in Hancock's custody, in violation of a court order.  So she turned over her materials to the police, with whom she works closely, and she took part in the trials.  Plaintiffs explain that "[f]alsifying facts to establish probable cause to arrest and prosecute an innocent person is . . . patently unconstitutional." *Hinchman v. Moore*, 312 F.3d 198, 205–06 (6th Cir. 2002).  But Hetzel never falsified evidence—she only worked with the police after Reguli and Hancock hid B.B. from the state in violation of a court order.  And, considering the statute's language, her recommendation wasn't "false" or "fabricated."  So she never violated clearly established law.

Alternatively, the plaintiffs argue that Hetzel can't receive qualified immunity because she wasn't performing a "discretionary function" of her job with the Department.  This misunderstands the caselaw.  To receive qualified immunity under state and federal law, Hetzel must've been performing a discretionary function of her employment. *See Ziglar v. Abbasi*, 582 U.S. 120, 150 (2017); *Lucas v. State*, 141 S.W.3d 121, 131 (Tenn. Ct. App. 2004).  But the plaintiffs don't identify any instance where this requirement has precluded immunity.  Still, Hetzel's conduct was well-within the bounds of her discretionary functions.  We've granted qualified immunity to a children's services employee who allegedly lied to a parent and made consequential misrepresentations about him to other state officials, even though the employee's behavior was "unrelated to her role as an advocate." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 726 (6th Cir. 2011).  Here, Hetzel represents the Department of Children's Services, which exists to "provide for the care of children served by the department." Tenn. Code Ann. § 37-5-105(3).  Her role often requires her to report crimes to the police. *See id.* §§ 37-1-403(a)(2); 37-1-403(c)(3).  So when a court order placed B.B. in the Department's

custody, Hetzel acted within her discretionary function by reporting Reguli and Hancock for hiding B.B. from the state.

### iii.

The two prosecutors, Helper and Evins, receive absolute immunity.  Under § 1983, prosecutors have absolute immunity when they function as "advocate[s] for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see Price v. Montgomery County*, 72 F.4th 711, 720–21 (6th Cir. 2023).  To determine whether a prosecutor acted as an advocate, we ask two questions.  First, when did the conduct occur?  *Buckley*, 509 U.S. at 270, 273.  If a prosecutor acted while "preparing for the initiation of judicial proceedings or for trial," he's more likely to receive absolute immunity.  *Id.* at 273.  Second, does the conduct traditionally fall within an advocate's discretion?  *See id.* at 268–69.  Absolute immunity protects prosecutors' conduct in bringing indictments or evaluating evidence, but it doesn't protect "perform[ing] the investigative functions normally performed by a detective or police officer."  *Id.* at 273; *Malley v. Briggs*, 475 U.S. 335, 343 (1986) ("[W]e shield the prosecutor seeking an indictment."); *see Smith v. Wayne County*, 147 F.4th 613, 619 (6th Cir. 2025).  In other words, "[p]rosecutors receive absolute immunity from suit for conduct in initiating and pursuing criminal prosecutions." *Jackson*, 64 F.4th at 743.  And they receive qualified immunity when they "perform investigative functions" typical of police.  *Smith*, 147 F.4th at 620 (citation modified).

Again, state immunity mirrors federal immunity.  *See Willett v. Ford*, 603 S.W.2d 143, 146–48 (Tenn. Ct. App. 1979).  Tennessee law follows the federal § 1983 standard to determine whether a prosecutor receives absolute immunity in a state malicious-prosecution claim.  *See id.*

The plaintiffs argue that Helper and Evins shouldn't have received absolute immunity for omitting the "visitation order" language from the indictment.  But under the *Buckley* test, the omission warrants absolute immunity.  The prosecutors drafted the indictment in "prepar[ation] for the initiation of judicial proceedings." *Buckley*, 509 U.S. at 273.  And their decision plainly fits "conduct in initiating . . . criminal prosecutions" because drafting the indictment is a prosecutor's key function in initiating a prosecution.  *Jackson*, 64 F.4th at 743.  This immunity

applies even if the prosecutors acted in bad faith, like the plaintiffs allege. *See Grant v. Hollenbach*, 870 F.2d 1135, 1138 (6th Cir. 1989).

Still, the plaintiffs resist this conclusion. They say that Helper and Evins were acting outside the scope of their prosecutorial duties because "[p]rosecutors only have authority and jurisdiction to prosecute crimes," and the plaintiffs didn't commit any crime. Appellant Br. at 42. The plaintiffs also cite Tennessee's prohibitions on prosecutors pursuing cases without probable cause. No court has ever accepted that reasoning, and for good reason. This circular argument would subsume the entire doctrine. If any defendant prevailed in a criminal proceeding on any legal ground, he could successfully sue his prosecutors because, in hindsight, no crime or probable cause existed. Although prosecutorial immunity "leave[s] the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty," qualifying this immunity "would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Imbler v. Pachtman*, 424 U.S. 409, 427–28 (1976).

**B.**

Because the defendants receive immunity, the conspiracy claims also fail. These claims rely on the same conduct as the malicious-prosecution claims—meetings between the defendants, a shared malicious motive, and a coordinated investigation and prosecution of the plaintiffs. And the plaintiffs lump this conduct together. Yet they fail to explain how any defendant could receive immunity from the malicious-prosecution claims, but not the conspiracy claims.

Recall the requirements of qualified and absolute immunity. For both, we analyze a state official's conduct. *See Wesby*, 583 U.S. at 63; *Buckley*, 509 U.S. at 273. For qualified immunity, we ask whether the defendant violated clearly established law. *See Wesby*, 583 U.S. at 63. And for absolute immunity, we ask whether the defendant was functioning as an "advocate for the State." *Buckley*, 509 U.S. at 273.

So each defendant receives immunity from the conspiracy claims for the same reasons they receive immunity from the malicious-prosecution claims. Defendants Russ, O'Neil, and

Hetzel receive qualified immunity because their conduct didn't violate clearly established law. *See Wesby*, 583 U.S. at 63. In fact, the plaintiffs don't cite any authority that's remotely analogous to this case. Next, defendants Evins and Helper receive absolute immunity because they only worked with the other defendants to "prepar[e] for the initiation of judicial proceedings." *Buckley*, 509 U.S. at 273. And to any extent that the prosecutors conspired as part of "the investigative functions normally performed by a detective or police officer," they receive qualified immunity for that conduct. *Id.* at 273–74; *see Price*, 72 F.4th at 719–20. Again, the plaintiffs fail to cite any caselaw that "every reasonable official would interpret . . . to establish" that the prosecutors acted illegally when they met with the other defendants. *Wesby*, 583 U.S. at 63.

## C.

The plaintiffs also bring a *Monell* claim against the City of Brentwood, relying on a ratification theory of liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986). Under this theory, Captain O'Neil "ratified" the decision to prosecute the plaintiffs, so the decision became the "official policy" of the city. *Monell*, 436 U.S. at 694.

But the plaintiffs misunderstand ratification. Their theory works only if state law gave Captain O'Neil "final policymaking authority" for the City of Brentwood. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013); *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005). It didn't. Under our precedent, "[m]ere authority to exercise discretion . . . does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). And under Tennessee law and Brentwood's municipal code, "[a]ll police officers shall obey and comply with such orders and administrative rules and regulations as the police chief may officially issue." Brentwood, Tenn., Code of Ordinances § 34-1; *see* Tenn. Code Ann. § 6-21-601. So because Captain O'Neil's decisions were "constrained by the official policies of [the police chief]," he lacked "final policymaking authority." *Feliciano*, 988 F.2d at 655; *Burgess*, 735 F.3d at 479. For that reason,

the plaintiffs can't bring a successful *Monell* claim against the city, even if the officers violated their constitutional rights.

**III.**

For the foregoing reasons, we AFFIRM.