RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0013p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SAGINAW COUNTY, MICHIGAN,

　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

STAT EMERGENCY MEDICAL SERVICES, INC.,

　　　　　　　　　　　　　*Defendant-Appellee*.

> No. 19-1424

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:17-cv-10275—Terrence George Berg, District Judge.

Argued:  December 11, 2019

Decided and Filed:  January 10, 2020

Before:  SUTTON, NALBANDIAN, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Douglas W. Van Essen, SILVER & VAN ESSEN, P.C., Grand Rapids, Michigan,
for Appellant.  Derek S. Wilczynski, BLANCO WILCZYNSKI PLLC, Troy, Michigan, for
Appellee.  **ON BRIEF:**  Douglas W. Van Essen, Elliot J. Gruszka, SILVER & VAN ESSEN,
P.C., Grand Rapids, Michigan, for Appellant.  Derek S. Wilczynski, Orlando L. Blanco,
BLANCO WILCZYNSKI PLLC, Troy, Michigan, for Appellee.

───────────────

## OPINION

───────────────

　　　SUTTON, Circuit Judge.  By ordinance, Saginaw County permits just one ambulance
service to operate within its borders.  STAT Emergency Medical Services is not that ambulance

service.  It objects to the exclusivity.  STAT has complied with all of the Michigan requirements for providing ambulance services in the State, and proceeded several years ago to offer its services in the county anyway.  Rather than enforce its ordinance against STAT, Saginaw County filed this declaratory judgment action in federal court against the company, seeking a ruling that the County's chosen means of delivering local ambulance services complies with state law, the Sherman Antitrust Act, and the U.S. Constitution.  The district court dismissed the case for lack of jurisdiction.  Because federal courts have the power to tell parties what the law is, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), not what it might be in a potential enforcement action by the government, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998), no jurisdiction exists.  We affirm.

I.

Located in central Michigan, Saginaw County is home to nearly 200,000 residents. Under local law, a single company provides the county's ambulance services.  The contractor responds to residents' medical emergencies from start to finish.  It handles the 911 calls, operates the county's emergency dispatch service, and staffs the ambulances.  The County signed its first contract along these lines in 2009, when it selected Mobile Medical Response for the job.  As is often true of exclusivity arrangements, the two sides benefitted from the deal.  The County guaranteed Mobile Medical the exclusive right to operate within its borders.  In return, Mobile Medical pledged to serve all eight of Saginaw County's cities and incorporated villages, and, perhaps most importantly, all twenty-seven of its rural townships.

In 2011, STAT Emergency Medical Services, a competing ambulance company, entered the Saginaw market.  It initially provided only patient-transport services for insurer Health Plus as part of a contract that covered six Michigan counties.  But STAT's work for Health Plus caught the attention of several municipalities dissatisfied with Mobile Medical's response times and fees.  Birch Run, a township within Saginaw County, decided to hire STAT in place of Mobile Medical.  After clearing a few local hurdles, STAT began operations.

When Saginaw County proposed to extend Mobile Medical's contract in 2013, STAT objected at two public meetings.  According to the County, STAT threatened to "take legal

action if the contract were renewed" on the theory that the arrangement violated state law, federal antitrust law, and the Fourteenth Amendment. R. 10 at 8. But STAT's threats had no effect on the deliberations, and the County approved the new agreement with Mobile Medical in October 2013.

In 2016, the County enacted a new ordinance that codified the exclusivity arrangement and regulated the provision of ambulance services.

Between October 2016 and January 2017, STAT and Saginaw County corresponded about the company's desire to increase its business in the area. The County maintained that, under its ordinance implementing the 911 Service Plan, STAT could not provide any ambulance services in Saginaw County without the Board of Commissioners' approval "through contract or resolution." *Id.* at 94. But the County never enforced the ordinance. STAT continued to insist that Michigan law permitted it to offer ambulance services and denied that the County had the authority to enact the ordinance or to sign an exclusive contract with Mobile Medical.

Saginaw County sued STAT in federal court. It asked the court for a declaratory judgment that Michigan law authorizes its exclusive contract with Mobile Medical and that the County does not violate federal antitrust laws or the U.S. Constitution by prohibiting STAT from operating in the county.

The district court ruled that the County failed to establish an actual or imminent injury and dismissed the case for lack of jurisdiction.

## II.

The U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Article III's bill of lading allows federal courts to deliver judgments on real disputes, not hypothetical ones, to resolve concrete disputes, not to pronounce judgments on theoretical disputes that may or may not materialize and, if they do, may appear in a variety of forms. *Steel Co.*, 523 U.S. at 101–03. That rules out advisory pronouncements, which the case-or-controversy requirement has long forbidden. *Summers v.*

*Earth Island Inst.*, 555 U.S. 488, 492–93 (2009); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42 (2006); *Muskrat v. United States*, 219 U.S. 346, 361–63 (1911).

The Declaratory Judgment Act does not alter these rules or otherwise enable federal courts to deliver "an expression of opinion" about the validity of laws. *Muskrat*, 219 U.S. at 362. Only in "case[s] of actual controversy" may the federal courts "declare" the parties' "rights and other legal relations" without granting traditional remedies such as damages or an injunction. 28 U.S.C. § 2201(a). The Act does not "change the essential requisites for the exercise of judicial power." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936). All it does is create an alternative remedy—a declaratory judgment—for *existing* cases or controversies, a point confirmed by the Supreme Court's long equation of the Act's "actual controversy" requirement with Article III's case-or-controversy imperative. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937).

Even when a claimant seeks declaratory relief, then, he must satisfy the prerequisites of the Declaratory Judgment Act and Article III's standing baseline. He must plausibly allege facts that, "under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation omitted).

There are three ways to think about Saginaw County's claim in the context of these requirements. Each one asks us to do something we cannot.

*First way.* Put aside that Saginaw County is a governmental entity. Start by thinking about it as no different from any other private entity or individual who has a legal quarrel with someone else. Like these other potential claimants, the County must show an imminent or actual injury before it enters the federal courts. It cannot sue simply to avoid a "*possible* future injury." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). The harm must be actual or "certainly impending." *Id.* at 410.

Whether one looks to the ordinance that contemplates an exclusive ambulance-services arrangement, the County's contract with Mobile Medical that puts that arrangement in place, or

the limited access to 911 dispatches, Saginaw County cannot point to an imminent harm on which to hang Article III standing. STAT has complained about all of these things, yes. And it has said once or twice that they violate federal antitrust and constitutional law. But there is a world of difference between talking about potential legal claims and acting on them. By all indications, STAT remains in the first camp. It first threatened legal action some six years ago, and yet it still has not sued the County. Saginaw County pleads nothing more than a "speculative fear" that STAT might institute a lawsuit at some time in the future. *Id.* That is not enough to state an injury in fact.

The Supreme Court's recognition of jurisdiction in *MedImmune* does not cut against this conclusion. It supports it. A patent licensee, who continued to pay royalties under a disputed patent license, asked for a declaration that the underlying patent was invalid. The Court held that, to demonstrate standing, the licensee did not need to show an imminent threat of a lawsuit. *MedImmune*, 549 U.S. at 137. But, in doing so, the Court did not jettison the requirement that claimants have an actual or imminent injury. The licensee faced a choice between paying the licensing fees now or potentially paying treble damages later. Either way, the licensee suffered an actual or imminent harm in the form of an immediate or threatened economic loss. *Id.* at 128. Article III, the Court held, does not require the plaintiff to "bet the farm" to obtain relief. *Id.* at 129.

While the *MedImmune* injury arose from a breach of contract that concretely confined the scope of the dispute, Saginaw County cannot say what conduct STAT's claims will reach because no enforcement action has occurred, and it will not occur unless and until the County opts to enforce its law against STAT. In contrast to the claimant in *MedImmune*, Saginaw County sits in the driver's seat. It can either enforce the law (which may lead to federal or state-law defenses against the County) or not (which leads to no injury to the County). On top of that, the County is not at risk of damages from any Sherman Antitrust Act claim. Even if STAT does sue, the Local Government Antitrust Act bars STAT from recovering any "damages, interest on damages, costs, or attorney's fees" from the County for violations of federal antitrust laws. 15 U.S.C. § 35(a).

Saginaw County points to the fact that its contract with Mobile Medical requires that company to indemnify it against any claims challenging the validity of their exclusivity contract. That agreement was reached in 2013, and STAT still has not sued—hardly evidence of an impending injury. No less importantly, the County may not bootstrap standing by "inflicting harm on" itself—adding an indemnity clause—"based on [its] fears of hypothetical future harm." *Clapper*, 568 U.S. at 416. All in all, the County does not face an impending injury.

*Second way.* Saginaw County of course is not an everyday entity. It is a public body. As a government, it has authority that private companies and individuals do not. It may lawfully use coercion to gets its way—by enacting a law on behalf of the people and enforcing it against unwilling residents. That reality suggests a different way of thinking about actual injuries—that they do not conventionally arise until the government has enacted a law, enforced it against a resident, and the resident has refused to comply. Then and only then, it would seem, does the sovereign sustain a cognizable injury—at least when it comes to enforcing public rights as opposed to enforcing the County's private contract or property rights.

That someone violates a law—here STAT's failure to comply with the exclusivity ordinance—does not by itself injure the government in an Article III way. Only "actual or threatened interference with [its] authority" does. *See United States v. West Virginia*, 295 U.S. 463, 473 (1935). A government's interest in the resolution of contested legal questions before an Article III tribunal, including those concerning the limits of its own power, thus extends only as far as the actual or threatened invasion of its sovereign right to enforce the law. The public body cannot turn to the federal courts to resolve mere "differences of opinion" about what its powers permit or what the law requires in a potential future application. *Id.* at 474.

When a government seeks a declaration that one of its laws is valid, it is not asking the courts to "declar[e] . . . any specific right." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 245 (1952). It merely aims, in the words of Justice Jackson, to "establish the major premise" of a legal argument that it can "hold in readiness for use" in the future, either to prosecute specific violations or to defend against a possible challenge. *Id.* That's not something an Article III court can provide, as the federal judicial power extends only to present disputes between presently constituted adverse parties. *Muskrat*, 219 U.S. at 361. An actual or imminent

injury not only helps to "define the controversy and to establish its existence," but it also ensures that the parties have genuinely adverse interests to match.  *West Virginia*, 295 U.S. at 474.  In this context, no justiciable controversy exists until a government claimant enforces the law against an individual.  Only then are the parties' interests sufficiently adverse for the court to pronounce the law's validity.  *See Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

Historical practice supports this perspective.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).  We are not aware of any case, whether under the federal courts' equity jurisdiction or under the Declaratory Judgment Act (enacted in 1934), that authorizes such lawsuits by state or local governments to enforce public rights in this way.  To the contrary, the historical practice of federal courts adds support to the conclusion that Saginaw County lacks standing to bring its claims.

From the Founding through the end of the nineteenth century, States could sue in federal court only to vindicate their "common-law interests," their property or contract rights.  *See* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 392–93 (1995).  But their sovereign interests (those pertaining to their "authority to exercise legislative, executive, or judicial power . . . over a particular subject matter") fell outside Article III jurisdiction altogether.  *Id.* at 410–11.  That's why it was unheard of, then and now, for States to bring criminal actions in federal court.  *Id.* at 422–31; *see Gwin v. Breedlove*, 43 U.S. (2 How.) 29, 36–37 (1844) (noting that generally "the courts of the United States hav[e] no power to execute the penal laws of the individual states"); *see also, e.g.*, *Huntington v. Attrill*, 146 U.S. 657, 672–73 (1892); *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 289–90 (1888).  State governments could not "ordinarily litigate against the federal government or other states['] conflicting claims [about their right] to regulate, nor could they seek to enforce their own legislation" outside their state courts.  Woolhandler & Collins, *supra*, at 393; *see, e.g.*, *Georgia v. Stanton*, 73 U.S. (6 Wall.) 50, 73–77 (1867) (holding that "merely political rights," as distinct from "the rights of persons or property, . . . do not belong to the jurisdiction of a[n Article III] court, either in law or equity"); *see also* David P. Currie, *The Constitution in the Supreme Court:  The First Hundred Years, 1789–1888*, at 302–04 (1992).

In the first half of the twentieth century, the Supreme Court loosened some of these standing limitations, permitting States "to depart from the common-law menu of litigable claims" and to pursue their interests as sovereigns directly. Woolhandler & Collins, *supra*, at 393. The Court warmed to *parens patriae* lawsuits in which governments assert "their citizens' general interests," say to stop a nuisance. *Id.*; *see Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (taking jurisdiction over an action by the State of Georgia to enjoin Tennessee copper plants from emitting noxious gasses that destroyed crops and orchards in Georgia). And Article III courts began to entertain suits that attempted to sort out the "relative regulatory power" of the state and federal governments. Woolhandler & Collins, *supra*, at 454. Even then, Article III standing still required that "the acts of the defendant . . . invade the [government's] sovereign right," resulting in some tangible interference with its authority to regulate or to enforce its laws. *Missouri v. Holland*, 252 U.S. 416, 431 (1920) (taking jurisdiction over an action by the State of Missouri to enjoin a federal officer from enforcing a federal statute that interfered with the State's ability to enforce its regulations on the same subject).

Even modern dilutions of the standing requirements for lawsuits by States, exemplified by *Massachusetts v. EPA*, 549 U.S. 497 (2007), have not meaningfully altered the core lessons from the historical understanding of Article III's case or controversy imperative. In holding that the States' claims of injury deserve "special solicitude in our standing analysis," *id.* at 520, the Supreme Court did not abandon the constitutional baseline. A government still must show that it suffers an "actual or imminent" invasion of a judicially cognizable interest—in Massachusetts' case its proprietary and sovereign interest in protecting coastal lands at risk from rising sea levels. *Id.* at 517, 521–23.

*Massachusetts v. EPA* also concerned a special case—a State suing the federal sovereign. In such cases, as well as in actions between States, the State does not have its usual recourse to state law and state enforcement proceedings to vindicate its interests. The Court acknowledged as much in explaining why Massachusetts could sue. *Id.* at 518–21. Saginaw County faces no such limitation when it comes to enforcing its ambulance-service law against private entities.

A contrary rule would open the door to piecemeal adjudication, encourage contrived lawsuits, and require the federal courts to stare down countless advisory-opinion requests as

government claimants rush to the federal courthouse for pre-enforcement advice.  Think of all the laws that governments enact that face litigation threats.  Could each public body sue first?  Then defend later?  What government body wouldn't relish the idea of "win[ning] any such case before it is commenced"?  *Wycoff*, 344 U.S. at 245.

If Article III permits pre-enforcement lawsuits by the government, by the way, why not say it permits pre-enactment lawsuits too?  And why not let private citizens bring the action?  It's just "like asking [for] a declaration that the State has no power to enact legislation that may be under consideration but has not yet shaped up into an enactment."  *Id.*  That, too, is not something the Third Branch can do.

(The States, incidentally, do not necessarily face similar limitations in their own courts.  A State's constitution may permit the state courts to issue advisory opinions.  It may even permit the state courts to issue advisory opinions about a law before the legislature enacts it.  *See, e.g.*, *Op. of the Justices to the Senate*, 802 N.E.2d 565, 567 (Mass. 2004); *Answer of the Justices to the Governor*, 302 N.E.2d 565, 569 (Mass. 1973).  To each State is left its own standing rules.  But even among the ten or so States that permit their courts to make advisory pronouncements, it's worth pointing out that these state constitutions often place other limits on the power.  Most of the States, for example, confine the ability to seek the courts' advice to the governor, state legislature, or other constitutional officers.  *See* Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 58 (7th ed. 2015).)

Pre-enforcement constitutional lawsuits also face a concreteness problem of their own.  It's difficult to bring an as-applied constitutional challenge before the gritty who/what/when details of enforcement have been worked out.  Which means that most, if not all, pre-enforcement constitutional challenges will be facial challenges—the most notoriously difficult for States to lose (and individuals to win) because any constitutionally permissible application of the law usually defeats the challenge.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987).  But this reality necessarily limits the value of the court's advice.  It will count for little in the as-applied constitutional challenge that comes next, one in which the claimant needs to show only

that the law violates his constitutional rights in this setting, not all settings in which it could be applied.

Saginaw County's effort to preclear the validity of its ordinance with the federal courts also reflects a cramped view of constitutional enforcement itself. Judges—Article III judges especially—are not the only officials with the ability *and the duty* to uphold our fundamental law. Officers at all levels of government are bound by oath to uphold the U.S. Constitution. *See* U.S. Const. art. VI, cl. 3. (And counterpart provisions in the state constitutions likewise require fidelity to those no-less-important charters. *See, e.g.*, Mich. Const. art. XI, § 1.) Their considered decision that a particular law or policy passes constitutional muster and may lawfully be enforced thus has real value in our system of government.

At least one other problem lurks. "Anticipatory judgment by a federal court," all before the local government liquidates its law into an enforcement order against a real entity, offends "our federalism," no matter whether a private or public entity launches the action. *Wycoff*, 344 U.S. at 247. The conventional route for resolving state enforcement actions is to let the state counties or agencies clarify how the law works in state court before a federal constitutional challenge ripens for resolution. That won't happen if either side can sue first in federal court before the contours of the local enforcement action take shape. *Cf. Younger v. Harris*, 401 U.S. 37, 43–49 (1971).

All of which takes us back to the central defect in this action: Saginaw County has never enforced the ordinance against STAT. That's ordinarily the first port of call for a local government seeking a remedy for violations of local law, and that's indeed what Saginaw County's code itself prescribes. *See* Saginaw County, Mich., Ordinance 120, art. 4.5 (Apr. 19, 2016). Without that enforcement action, any injury the County might suffer in the future is not "certainly impending." *Clapper*, 568 U.S. at 410. Saginaw County thus alleges only a "speculative fear" that, *if* it enforced the ordinance a certain way against STAT, the company *might* respond by haling it into court on legal theories that were never clearly stated, let alone threatened. *Id.* That is not enough for an Article III injury.

*Third way.* There is another jurisdictional problem with this lawsuit, one not briefed below or here. Saginaw County filed this action under the federal courts' "arising under" jurisdiction. *See* 28 U.S.C. §§ 1331, 1337. That was a good idea in one respect. No diversity exists between STAT (based in Michigan) and Saginaw County (based in Michigan). Invoking the court's federal-question jurisdiction was the only option available. But does it work?

We are skeptical. In *Franchise Tax Board v. Construction Laborers Vacation Trust*, the Supreme Court held that declaratory-judgment actions by States "to declare the validity of their regulations despite possibly conflicting federal law" do not "arise under" federal law within the meaning of §§ 1331 and 1337. 463 U.S. 1, 8 n.7, 19–22 (1983). States, the Court reasoned, can "enforce their own laws in their own courts," which can adjudicate any questions of federal law that the enforcement action raises, thus obviating the need for federal jurisdiction. *Id.* at 21. And States, the Court observed, "are not significantly prejudiced by an inability to come to federal court for a declaratory judgment in advance of a possible injunctive suit." *Id.* So, it reasoned, the usual rule that claimants may seek a declaratory judgment in anticipation of a federal lawsuit that the defendant could have brought as a plaintiff does not apply to the States. *See id.* at 21–22; *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672–73 (1950).

This limitation explains, in part, why governments generally do not file declaratory-judgment actions to validate controversial laws before enforcing them, even though individual plaintiffs frequently turn to the federal courts for pre-enforcement declaratory relief. In the rare cases in which States have ventured down this path, the federal courts have prohibited the claims under a straightforward application of *Franchise Tax Board*. *See Texas v. Travis County*, 910 F.3d 809, 812 (5th Cir. 2018); *Missouri ex rel. Mo. Highway & Transp. Comm'n v. Cuffley*, 112 F.3d 1332, 1334–37 (8th Cir. 1997).

But counties and cities are not States. Does the same prohibition apply when local governments sue for declaratory relief and invoke §§ 1331 and 1337's "arising under" jurisdiction? We think so. As is true for the States, not many local governments have tried this path. But when they have (in truth, it has) done so, the case did not end well. *See Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 611 F. Supp. 315, 317–19 (C.D. Cal. 1984). More fundamentally, the States and local governments share a quality—the coercive

capacity to make people do what they want on pain of imprisonment or fines—that distinguishes them from private actors. Local governments, like States, control the implementation of their own laws. As such, they are equally well equipped to make clear how the law works in the concrete setting of an enforcement action and equally well equipped to handle any uncertainty about how the law works until then. How strange, moreover, if the same rules did not apply in both governmental settings—if a State were barred from seeking relief in federal court but the administrative subdivisions that it created were not. The same rules, we think, ought to apply to both.

We affirm.