RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
────────────────

BLANCHE BARBER, individually, and a class of similarly situated individuals,

*Plaintiff-Appellant,*

*v.*

CHARTER TOWNSHIP OF SPRINGFIELD, MICHIGAN; CHARTER TOWNSHIP OF SPRINGFIELD, MICHIGAN PARKS AND RECREATION; OAKLAND COUNTY, MICHIGAN; OAKLAND COUNTY PARKS AND RECREATION COMMISSION,

*Defendants-Appellees.*

┐
│
│
│
> No. 20-2297
│
│
│
┘

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-13519—Nancy G. Edmunds, District Judge.

Argued: December 9, 2021

Decided and Filed: April 11, 2022

Before: MOORE, CLAY, and READLER, Circuit Judges.
────────────────

## COUNSEL

**ARGUED:** Ann Marie Pervan, KELLER & AVADENKA, P.C., Bloomfield Hills, Michigan, for Appellant. Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Springfield Township Appellees. Daniel A Klemptner, OAKLAND COUNTY, Pontiac, Michigan, for Oakland County Appellees. **ON BRIEF:** Ann Marie Pervan, KELLER & AVADENKA, P.C., Bloomfield Hills, Michigan, for Appellant. Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Springfield Township Appellees. Daniel A Klemptner, OAKLAND COUNTY, Pontiac, Michigan, for Oakland County Appellees.

CLAY, J., delivered the opinion of the court in which MOORE, J., joined. READLER, J. (pp. 14–17), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

CLAY, Circuit Judge.   Plaintiff Blanche Barber seeks a preliminary injunction against Defendants Charter Township of Springfield (the "Township"), Oakland County (the "County"), and both the Township and the County's Parks and Recreation departments (collectively, "Defendants"), to prevent Defendants from removing a dam near Barber's property.   Barber alleges that Defendants' plan to remove the dam amounts to an unconstitutional taking and a trespass.   Defendants filed a motion for judgment on the pleadings, which the district court granted.   Barber now appeals.   For the reasons set forth below, we **REVERSE** the district court's order and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

Barber owns land "directly adjacent" to Mill Pond and the Mill Pond Dam (the "Dam") in Springfield Township, Michigan.  (Am. Compl., R. 12, Page ID #130.)  A land survey showed that parts of her property "run directly into the Mill Pond" and include parts of the pond itself.  (*Id.* at Page ID #144.)  The Dam was built in 1836, and Barber's home was built several years later.  Today, the Township and the County are jointly responsible for maintaining the Dam.  In October 2018, Oakland County Parks and Recreation conducted a Feasibility Study to determine the future of the Dam.  That study gave Defendants seven options:  four required upgrading or repairing the Dam and three involved removing the Dam.  On June 6, 2019, members of the Springfield Township Board ("the Board") met to discuss these options and ultimately recommended removing the Dam.

After this meeting, Defendants "agreed to remove" the Dam and entered into "Phase II – Mill Pond Dam Removal and Restoration Design/Engineering Services."  (*Id.* at Page ID #130.)  During this phase, Defendants hired engineering firms and allocated parts of the annual budget to the project.  On February 14, 2020, the Township released a statement on its website saying that, "the project has moved to the next phase which includes preliminary engineering and conceptual park design."  (*Id.* at Page ID #136–37.)  On appeal, Barber points to a local newspaper article

titled "Mill Pond Dam to be Removed Next Year," that ran on March 6, 2021. (Dkt. No. 20, Exh. A (hereinafter "Newspaper Article").) The article reported that the Dam removal project was "scheduled to begin in 2022." (*Id.*) At oral argument, defense counsel admitted that Defendants have decided to remove the Dam and plan to break ground on the demolition this spring.

Barber alleges that removing the Dam will decrease her property value, interfere with her riparian rights, deprive her of her right to use and enjoy her land, and physically damage her property. She alleges that it "will likely pollute, impair and destroy natural resources, including . . . surface water, wetlands, and wildlife and natural habitat." (Am. Compl., R. 12, Page ID #132–33.) Further, removing the Dam "may cause flooding and property damage to Plaintiff's residence." (*Id.*) She goes on to list other effects, alleging that it would: increase pedestrian traffic around her property; increase noise and waste levels; eliminate fishing on the Mill Pond and disturb the fish community; create a nuisance to adjacent property owners; significantly decrease her property value; create "an area of swamp and stink;" destroy natural habitats; threaten endangered species in the area; lower the water table and drain the surrounding wetlands; increase pollution in the water; and affect septic systems. (*Id.* at Page ID #138–39.)

Barber sued Defendants on October 28, 2019 in state court, and the case was removed to federal court on November 27, 2019. *See Barber v. Charter Twp. of Springfield*, No. 19-13519, 2020 WL 7122073, at *2 (E.D. Mich. Dec. 3, 2020). She sought to enjoin the Dam-removal project, alleging that it would constitute a taking under the federal and Michigan constitutions and a trespass under Michigan law. After the suit was removed to federal court and Barber amended her complaint, Defendants filed a motion for judgment on the pleadings. *See id.* The district court granted Defendants' motion, finding that Barber's claims were not ripe and that she lacked standing to bring suit. *Id.* at *3–*6. The district court failed to address Defendants' remaining arguments, namely that Barber's amended complaint did not state plausible facts to support her takings claim. *See id.* Nor did the court reach the merits of Barber's request for a preliminary injunction. *See id.*

## II. DISCUSSION

### A. Jurisdiction

Barber brought a claim under 42 U.S.C. § 1983 alleging that Defendants violated her Fifth Amendment rights. Therefore, the district court had federal question jurisdiction under 28 U.S.C. § 1343(a)(1). *See Sexton v. Cernuto*, 18 F.4th 177, 183 (6th Cir. 2021). This Court has appellate jurisdiction because Barber timely appealed from a final order dismissing her case. *See id.* § 1291; Fed. R. App. P. 4.

### B. Standard of Review

"We review *de novo* a district court's grant of a Rule 12(c) motion for judgment on the pleadings." *Engler v. Arnold*, 862 F.3d 571, 574 (6th Cir. 2017) (citing *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)). Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." We assess a Rule 12(c) motion "using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6)." *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659 (6th Cir. 2021) (quoting *Moore v. Hiram Twp.*, 988 F.3d 353, 357 (6th Cir. 2021)). Thus, "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Engler*, 862 F.3d at 575 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). "When ruling on a defendant's motion to dismiss on the pleadings, a district court 'must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief.'" *Id.* at 574–75 (citing *Kottmyer*, 436 F.3d at 689). "But we 'need not accept as true legal conclusions or unwarranted factual inferences.'" *Moderwell*, 997 F.3d at 659 (quoting *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017)).

### C. Analysis

Barber claims that Defendants' decision to remove the Dam—and the Dam's eventual destruction—amounts to an unconstitutional taking of her property without just compensation in

violation of the Fifth Amendment.**1**  The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (quoting U.S. Const. amend. V).  The Fifth Amendment prohibits both "physical takings" and "regulatory takings." *Id.* at 2071–72.  Physical takings include when the government "uses its power of eminent domain to formally condemn property," "physically takes possession of property without acquiring title to it," or "occupies property." *Id.* at 2071. This third type of physical taking, occupation, can occur "say, by recurring flooding as a result of building a dam." *Id.* (citing *United States v. Cress*, 243 U.S. 316, 327–28 (1917)).

The regulatory takings jurisprudence recognizes that the Fifth Amendment is "not limited to physical appropriations of property." *Id.* (citing *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015)).  Thus, if a "regulation goes too far it will be recognized as a taking." *Id.* at 2072 (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).  The regulatory takings doctrine developed primarily in the context of land-use restrictions such as zoning ordinances. *See id.* Although quite different, the doctrines for physical takings and regulatory takings can overlap. In *Cedar Point Nursery*, the Supreme Court found that a regulation allowing union workers to enter agricultural workplaces was a *per se* physical taking. *Id.* at 2069, 2080.  Accordingly, "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Id.* at 2072.  Barber raises both claims.  She alleges that the decision to remove the Dam amounted to a regulatory taking and its eventual removal will exact a physical taking.

The district court did not reach the merits of her claims.  Rather, it found that it lacked the power to hear her claims. *See Barber*, 2020 WL 7122073 at *4–*5.  Therefore, this Court reviews only whether her claims are justiciable, not whether her claims will otherwise succeed

---

**1**In her Amended Complaint, Barber also brought state law claims including a takings claim under the Michigan Constitution and a state law trespass claim.  On appeal, she only challenges the district court's findings as to her Fifth Amendment takings claims.  Thus, she has abandoned her state law claims on appeal, and the Court will not address them. *See United States v. Melton*, 782 F.3d 306, 308 n.1 (6th Cir. 2015) (citing *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 540 (6th Cir. 2014)).

on the merits.**2**  "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'"  *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 816 (6th Cir. 2017) *abrogated on other grounds by Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167–68 (2019) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)).  Two Article III doctrines are in issue here.  First, federal courts may only hear claims that are ripe for review; second, a plaintiff must have standing to bring her claims.

        1. Ripeness

The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over [governmental] policies, and also to protect the [governmental entity] from judicial interference until a[] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  A takings claim is ripe if "the plaintiff has received a 'final decision' from the relevant government actor" indicating how it will regulate or use the property.  *Wilkins v. Daniels*, 744 F.3d 409, 417 (6th Cir. 2014) (citing *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 (1985), *overruled on other grounds by Knick*, 139 S. Ct. 2162).  "The finality requirement is relatively modest."  *Pakdel v. City & Cnty. of San Francisco*, 141 S. Ct. 2226, 2230 (2021).  Indeed, "nothing more than *de facto* finality is necessary."  *Id.*  Although this Court "appl[ies] this test to both regulatory and physical takings claims," *Wilkins*, 744 F.3d at 417 (citing *Hensley v. City of Columbus*, 557 F.3d 693, 696 n.2 (6th Cir. 2009)), courts have further sculpted the ripeness doctrine to fit the type of takings claim involved.

---

**2**Had the district court found that Barber's claims were justiciable, it would have needed to consider Barber's request for a preliminary injunction.  To determine whether a plaintiff is entitled to a preliminary injunction, courts must weigh four factors:  "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  *Lexington H-L Servs., Inc. v. Lexington-Fayette Urban Cnty. Gov't*, 879 F.3d 224, 235–36 (6th Cir. 2018) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc)).  In this case, the first factor—likelihood of success on the merits—would consider the strength of Barber's Fifth Amendment takings claim.

Ordinarily, "[w]ith a 'physical taking,' the taking itself is viewed as a final action because, once the property's value has been allegedly destroyed, there is nothing else to do." *Hensley*, 557 F.3d at 696 (citing *Coles v. Granville*, 448 F.3d 853, 862 (6th Cir. 2006)). This rule logically applies when the plaintiff seeks monetary damages, but it cannot apply when the plaintiff seeks injunctive relief. Until recently, the Supreme Court expressed skepticism that a takings claim for injunctive relief would ever be ripe. *See Knick*, 139 S. Ct. at 2175, 2179. However, last year the Court found that an impending physical taking could warrant injunctive relief. *See Cedar Point Nursery*, 141 S. Ct. at 2070, 2072. In *Cedar Point Nursery*, the plaintiffs sought to enjoin a local regulation that allowed union representatives to enter private property and speak to agricultural workers. *Id.* at 2070. The Court, treating the claim as a *per se* physical taking, allowed the plaintiffs to proceed with their motion for a preliminary injunction *even though* union representatives had never set foot on one plaintiff's property. *See id.* Thus, the plaintiffs could bring suit even without *experiencing* a physical intrusion because the regulation allowed *future* physical intrusions. *See id.* at 2070, 2072–73. Accordingly, a claim for injunctive relief is ripe if the government has reached a final decision that will enable a future physical taking.

Barber's physical and regulatory takings claim arise out of the same conduct—Defendants' decision to remove the Dam. According to Barber, this decision amounts to a regulatory taking and the inevitable demolition of the Dam will amount to a physical taking. Under these circumstances, both claims are ripe if Defendants have "reached a final decision" about the Dam's future. *Lilly Investments v. City of Rochester*, 674 F. App'x 523, 526 (6th Cir. 2017) (quoting *Williamson*, 473 U.S. at 186); *Wilkins*, 744 F.3d at 417 (citing *Hensley*, 557 F.3d 693, 696 n.2).

Defendants have reached a final decision to remove the Dam. A March 2021 newspaper article confirms as much, reporting that the Dam removal project is "scheduled to begin in 2022." (Newspaper Article, Dkt. No. 20, Exh. A.)[3] And at oral argument, when asked if

---

[3]This article ran after the district court issued its decision. Thus, it was not a part of the record before that court. Even so, "since ripeness is peculiarly a question of timing, it is the situation now rather than the situation at the time of the District Court's decision that must govern." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 139 (1974). "Our inquiry must thus focus on whether [the plaintiff's] claim is presently ripe, rather than on whether it

Defendants had decided to demolish the Dam, defense counsel stated that, "The choice has been made to . . . move forward to remove the Dam." (Oral Arg. at 31:15.) Having conceded this point, Defendants are left with one argument; until the Dam is actually removed, there is no way to know whether Barber has a viable takings claim. But this cannot be the case in the wake of *Cedar Point Nursery*. As the Supreme Court made clear, plaintiffs may sue for injunctive relief even before a physical taking has happened. *Cedar Point Nursery*, 141 S. Ct. at 2070, 2072–73.[4] Barber's claims are therefore ripe.

2. Standing

"For a dispute to qualify as an Article III 'case [or controversy]' that a federal court may resolve, the plaintiff who brings the dispute to the court must have 'standing.'" *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021) (quoting *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 860 (6th Cir. 2020)). "To satisfy Article III's standing requirement, a plaintiff must have suffered some actual or threatened injury due to the alleged illegal conduct of the defendant; the injury must be 'fairly traceable' to the challenged action; and there must be a substantial likelihood that the relief requested will redress or prevent the plaintiff's injury." *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)). When assessing standing, courts look only to "the facts existing when the complaint is filed." *Lujan v.*

---

was ripe when the district court dismissed [the] complaint." *Syron v. ReliaStar Life Ins. Co.*, 506 F. App'x 500, 503 (6th Cir. 2012); *see also Crosby v. Pickaway Cnty. Gen. Health Dist.*, 303 F. App'x 251, 260 (6th Cir. 2008) (considering recent developments in a party's related state litigation when relevant to the ripeness inquiry); *Casden v. Burns*, 306 F. App'x 966, 971–73 (6th Cir. 2009) (recognizing that claims may "become ripe" as litigation unfolds, and this Court may consider "intervening change[s] in circumstances").

[4]Much of the confusion in this case is because the parties, and the district court, merge their discussion of *merits* questions with *ripeness* questions. Indeed, Defendants argue that "[t]he amended complaint comes nowhere close to alleging that a taking has occurred." (Def. Br. at 25.) The district court agreed. *See Barber*, 2020 WL 7122073, at *4 ("There are not sufficient factual allegations establishing that a taking of Plaintiff's property has or likely will occur."). While the ripeness inquiry addresses unique issues in takings cases, courts must not use the ripeness doctrine as an opportunity to prematurely reach thorny merits questions. For example, Defendants argue that Barber has not shown a sufficient property interest under Michigan law, and Defendants focus heavily on other questions that go to the merits: whether Barber can sue for injunctive relief to prevent a taking; whether she is limited to seeking just compensation as a remedy after a taking; and whether her claims are best treated as a physical taking or a regulatory taking. But these are not *ripeness* questions. We leave it to the district court to consider these merits questions on remand.

*Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992); *see also Price v. Medicaid Director*, 838 F.3d 739, 746 (6th Cir. 2016) (quoting *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991)).

Defendants only challenge the first prong, known as the "injury in fact" requirement.[5] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–61). To satisfy this prong, a plaintiff must plausibly allege that she will suffer an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). That does not mean that she must have already suffered an injury. *See Clapper*, 568 U.S. at 409. Rather, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210 (citing *Clapper*, 568 U.S. at 414 n.5).

Barber claims that she will suffer several injuries when the Dam is removed. She alleges that removing the Dam will, among other things: "cause flooding and property damage to Plaintiff's residence;" increase pedestrian traffic around her property; increase noise and waste levels; create a nuisance to adjacent property owners; significantly decrease her property value; "pollute, impair and destroy natural resources, including . . . surface water, wetlands, and wildlife and natural habitat;" and lower the water table and drain the surrounding wetlands. (Am. Compl., R. 12, Page ID #138–39.)

Defendants argue that these risks of future harm do not give her standing. To start, they argue that "even if [the Dam] is removed, Plaintiff's allegations are insufficient to support a finding of an unconstitutional taking." (Def. Br. at 31.) That may well be true, but—as with the ripeness inquiry—courts must not "conflate[] the merits of [the plaintiff's] takings claim with [her] standing to bring it." *CHKRS*, 984 F.3d at 489. "[J]ust because a plaintiff's claim might fail on the merits does not deprive the plaintiff of standing to assert it." *Id.* (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). "If that were the test, every losing claim would be

---

[5]For good reason. There is little doubt that the causation and redressability prongs are satisfied. As to causation, Defendants jointly manage the Dam and, as discussed below, they decided to demolish it before this case was removed to federal court. And the relief Barber seeks, an injunction barring Defendants from removing the Dam, would prevent (and therefore redress) all of Barber's claimed harms.

dismissed for want of standing." *Id.* (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc)).**[6]**

Defendants next allege that the risk of harm that Barber faces is merely speculative and unlikely to occur. When a plaintiff sues for injunctive relief, "[t]he threat of future harm can satisfy this requirement as long as there is a 'substantial risk' that the harm will occur." *Kanuszewski v. Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 405 (6th Cir. 2019) (quoting *Clapper*, 568 U.S. at 414 n.5). The "threatened injury must be *certainly impending* to constitute injury in fact." *Clapper*, 568 U.S. at 409 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). In the leading Supreme Court case on this issue, the Court found that the plaintiffs lacked standing to enjoin a government surveillance program because the plaintiffs merely alleged that the government *might* intercept their future communications. *See id.* at 410. In *Clapper*, the plaintiffs' theory of harm relied "on a highly attenuated chain of possibilities," and therefore did not meet the "certainly impending" requirement. *Id.* Among other things, the government would need to target the plaintiffs for surveillance, get approval from a court to do so, and successfully intercept the plaintiffs' communications. *See id.*

Unlike in *Clapper*, the chain between Defendants' actions and Barber's harm is hardly attenuated. Defendants start by arguing that "[t]here has *not* been a final decision to remove the Dam," and, therefore, any injury deriving from the Dam's removal is purely "speculative." (Def. Br. at 30–31 (emphasis in original).) Whether Defendants decided to remove the Dam is certainly relevant to the standing inquiry; if Defendants were waffling between various options,

---

**[6]**By speculating and engaging in conjecture about the *magnitude* of the harm that Barber will suffer, the dissent prematurely adjudicates the *merits* of Barber's claim. The dissent points out that Barber's future harm depends on "the success of [Defendants'] restoration efforts." (Dissent at 15.) To start, Defendants have provided no evidence of their plans to remediate the land after removing the Dam. By relying on these undisclosed remediation efforts, the dissent blindly accepts Defendants' assurances while dismissing the factual allegations in the complaint.

Even if Defendants had disclosed their proposed remediation efforts, those after-the-fact plans are only relevant when considering whether Barber is likely to suffer *irreparable* injury, one of the four preliminary injunction factors. *Lexington H-L Servs., Inc.*, 879 F.3d at 235–36 (quoting *Schimmel*, 751 F.3d at 430). But to establish standing, Barber does not need to show that her future harm will be *irreparable*. *See Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *3 (6th Cir. Feb. 8, 2022) (order). Barber has standing to seek injunctive relief because she faces a "risk of harm [that] is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210 (citing *Clapper*, 568 U.S. at 414 n.5). How Defendants plan to mitigate Barber's risk of harm is a merits question that the district court should consider when weighing the preliminary injunction factors.

then Barber's alleged harm would not be imminent. The relevant inquiry is whether Barber's alleged future harm was imminent at the time of her complaint. *See Price*, 838 F.3d at 746 (quoting *Cnty. of Riverside*, 500 U.S. at 51–52). Defendants have admitted that they planned to remove the Dam in the near future. However, the question is whether they had made those plans at the time Barber filed her complaint, and there is ample evidence that they had so decided. Looking at the facts as they existed on November 27, 2019,[7] Barber pleaded sufficient facts to support the conclusion that Defendants decided to remove the Dam before Barber sued. On June 6, 2019, the Board met to discuss the Feasibility Study and assess its options for the Dam's future. After weighing seven proposals, the Board recommended removing the Dam. At the close of this meeting, one town trustee said "that the Board came to a decision." (Compl., Exh. 1, R. 1-2, Page ID #41.) Township residents who attended the meeting stated that, although the Board was purportedly open to discussion, it seemed quite clear that "the Board ha[d] already made a decision." (*Id.* at Page ID #40.) The project then entered "Phase II – Mill Pond Dam Removal and Restoration Design/Engineering Services." (Am. Compl., R. 12, Page ID #130.) By October 2019, Defendants had contracted with AECOM, an engineering firm, "for removal and restoration design/engineering services." (*Id.* at Page ID #136.) A change order to this contract, dated October 15, 2019, budgeted up to $168,530 for AECOM's "preliminary Design Engineering, Grant Writing Assistance, and Conceptual Park Design." (*Id.*) On November 14, 2019, the Board again moved to increase the contract with AECOM. As the Township Clerk noted in the June 6 meeting, "it would not be the intent to go into the next phase and engineer more than one alternative." (Compl., Exh. 1, R. 1-2, Page ID #36.) A Township Treasurer

---

[7]There is some room for debate over the operative date for standing purposes in this case. Barber filed her original complaint in state court on October 28, 2019. But the case was removed to federal court on November 27, 2019. This Court has not clarified whether the state court filing date or the date of removal to federal court is the date to consider when analyzing standing. Lower courts have concluded that the removal date governs. *See Renteria-Villegas v. Metro. Gov't of Nashville & Davidson Cnty.*, 796 F. Supp. 2d 900, 905 (M.D. Tenn. 2011); *Kelley v. Shelby Cnty. Bd. of Educ.*, 198 F. Supp. 3d 842, 849 (W.D. Tenn. 2016). We agree. Standing is a question of Article III jurisdiction. *See CHKRS, LLC*, 984 F.3d at 488. It logically follows that standing should be determined as of the date that the federal court assumed Article III jurisdiction, *i.e.*, the date of removal.

There is one further issue as to the operative date. Barber amended her complaint in federal court in February 2020. However, this Court looks to the plaintiff's original complaint when determining standing. *See Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004) (holding that the operative complaint for purposes of determining standing is that which adds the relevant plaintiff to the action). Thus, the question is whether Barber had standing on November 27, 2019.

echoed this sentiment, stating that Defendants would "not . . . run dual engineering" on different proposals at the same time.  (*Id.* at Page ID #40.)   By proceeding with even preliminary engineering, the record supports the conclusion that, by November 27, 2019, Defendants had decided to remove the Dam.[8]  Thus, the Dam's removal was not a "highly attenuated" link in a "chain of possibilities."  *Clapper*, 568 U.S. at 410.

Defendants next argue that, even if they had already decided to remove the Dam, Barber's anticipated injuries from the Dam removal project were still speculative.  According to Barber, demolishing the Dam creates a substantial risk that she will suffer many injuries.  Some are more likely than others.  But at the very least, she alleges that her property extends to the water line of the Mill Pond and even includes part of the Mill Pond.  Therefore, removing the Dam will change the flow of water on Barber's property and likely alter the property's configuration.  That is all that is needed.  Barber is likely to suffer an injury the moment the Dam comes down, making the harm "certainly imminent."

She also plausibly alleges that she faces a risk of "concrete" and "particularized" injuries.  The future harm is particularized because it will "affect [her] in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1).  Barber's direct proximity to the Mill Pond and the Dam create the risk of future harm when the Dam is removed.  These harms are unique to her property and thus sufficiently particularized.  Her future injuries are also "concrete."  To start, "the risk of real harm" can be sufficient to satisfy the concreteness requirement, *Spokeo*, 578 U.S. at 341 (citing *Clapper*, 568 U.S. at 398), meaning that Barber's harms can be concrete even before they materialize.  Whether or not any future harm will amount to a taking, Barber faces a "substantial" risk of future harm. *TransUnion*, 141 S. Ct. at 2210 (citing *Clapper*, 568 U.S. at 414 n.5).  For example, Barber contends that removing the Dam would likely cause her property to flood.  Thus, she faces a

---

[8]With little to combat these facts, the dissent ironically retorts that the decision was not final because there remained "the *possibility* that defendants would *abandon* the project." (Dissent at 16 (emphasis added).)  As one such "possibility," the dissent argues that the Dam's removal was speculative because there remained some hypothetical risk that Defendants would not be able to scrounge up the funds to execute the project.  But even the dissent recognizes that Defendants invested *at least* $600,000 into the Dam removal and restoration project, which clearly indicates that funding was not a pressing issue.  In an attempt to undermine the record evidence showing that Defendants had decided to remove the Dam, the dissent engages in precisely the kind of unsupported speculation that it claims to admonish.

"risk of future harm" that "is sufficiently imminent and substantial" thereby giving her standing to seek injunctive relief. *TransUnion*, 141 S. Ct. at 2210 (citing *Clapper*, 568 U.S. at 414 n.5).

## III. CONCLUSION

For these reasons, having determined that Barber's claims are ripe, and that she has standing to sue, we **REVERSE** the district court's order and **REMAND** for the district court to further consider whether Barber is entitled to injunctive relief and whether she is entitled to proceed with her takings claim.

———————————

**DISSENT**

———————————

CHAD A. READLER, Circuit Judge, dissenting. We should begin and end with the foundational principle that a plaintiff must face "actual or imminent" harm to have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted). When Blanche Barber sued to enjoin defendants from removing a dam near her home, they had yet to draft—much less approve—blueprints for the project. Nor could defendants afford to dismantle the dam absent future largesse from funding agencies. And nowhere did the complaint say when construction work might begin. At best, Barber alleged that defendants hoped to remove the dam some day in the future. But "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* at 564; *cf. Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958–60 (8th Cir. 2001) (concluding that tenants faced no "certainly impending" harm from a proposal to modernize their public housing complex where "demolition has not yet started, drawings are still in the preliminary phase, and no new construction has begun" before dismissing their suit as unripe).

And what harm would the dam's theoretical removal cause? Barber's allegations that the project will "impact" her, "impair . . . natural habitat," and "affect" surface water leave key questions unresolved. Impact how? What habitat? Affect surface water where? Without answers, these claims "amount to nothing more than the type of 'unadorned, the defendant-unlawfully-harmed-me' accusations that *Iqbal* deemed insufficient." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 374 (6th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (characterizing allegations that the defendants shared private information as insufficient where the plaintiffs failed to say what information had been shared, who shared it, or why the sharing impaired their rights); *see also Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 482–83 (6th Cir. 2020) (deeming allegations that the defendants had falsely represented the plaintiffs' debt "too conclusory" because the complaint did not identify what the false representation was, when it was made, or who made it); *Ass'n of Am. Physicians &*

*Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 543–44 (6th Cir. 2021) (applying plausibility pleading requirements to standing).

To be fair, Barber did present other allegations. Yet those allegations were so numerous that any attempt at consistency (and with it, certainty) washed away in the torrent. She contended that dismantling the dam would drain the pond by her home yet flood her property; destroy wetlands yet create swamps; and "Threaten Endangered Species such as [the] Eastern Massasauga Rattlesnake," thereby (as counsel explained at oral argument) inciting the reptiles to "go out into the town . . . and start biting people," making snakes "more prevalent." Which of these harms would occur (if any), not to mention when, remains anyone's guess. Compounding this uncertainty, Barber alleged that defendants had allocated over $600,000 for what she described as "Mill Pond Dam Natural Area Restoration." Whether Barber faced harm thus turned not only on whether defendants would remove the dam but also on the success of their restoration efforts, further undercutting her argument for standing. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 387–88 (6th Cir. 2020) (describing the threat of future harm from Tennessee's signature verification process for absentee ballots as speculative because "[m]any voters . . . will likely have an opportunity to cure any errors in their initial absentee ballot").

Applying an ounce of "experience and common sense" reveals that Barber had little idea how the project, should it come to fruition, would affect her property. *Iqbal*, 556 U.S. at 679. Instead, her fears rested on "mere speculation and assumptions," a far cry from the "*certainly impending*" injury necessary to establish standing where harm has yet to occur. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 410 (6th Cir. 2019) (cleaned up) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 411 (2013)).

With no help from the complaint, the majority opinion resorts to misdirection. It first suggests that the dam will be removed "in the near future" based on information gleaned from oral argument. *Supra*, at 11. But the state of the project today is "entirely irrelevant to the question of standing." *Lynch v. Leis*, 382 F.3d 642, 647 (6th Cir. 2004). Standing, of course, is determined at the time a suit is filed, not years later. *See Price v. Medicaid Dir.*, 838 F.3d 739, 746 (6th Cir. 2016). More than anything, appeals to recent developments confirm the absence of

any allegations in Barber's complaint indicating when the dam's purportedly "imminent" removal might occur.

Next up is the hubbub over parts of the record that say the township "came to a decision" at a June 2019 public meeting. *Supra*, at 11. But it was not a decision to remove the dam. In fact, the township's only "decision" was to propose removing the dam to the county. Yet the county, which owns the dam, remained free to reject the recommendation.

From there, the majority opinion draws two more conclusions from the record: (1) township officials expressed reluctance at the June meeting to prepare engineering plans for more than one proposal as to the dam's future; and (2) defendants subsequently awarded contracts for preliminary design work. Putting the two together, the majority opinion infers that the dam's fate was sealed by November 2019. That inference, however, overlooks the possibility that defendants would abandon the project if the preliminary plans proved unsatisfactory. After all, as the township's consulting engineer warned, further study might reveal "red flags that can kill a project." This uncertainty belies the conclusion that Barber met her burden to "clearly . . . allege facts demonstrating" standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). In any event, emphasizing whether defendants had decided to remove the dam obscures another essential question: when might construction work begin? Here, the majority opinion has no answer, further undermining its conclusion that Barber's complaint plausibly alleged imminent harm. *See Lujan*, 504 U.S. at 564.

Finally, the majority opinion deems Barber's alleged future injuries nonspeculative because the dam's removal will "change" how water flows somewhere on Barber's land and "alter the property's configuration." *Supra*, at 12. Yet the majority opinion fails to describe this hypothetical change or give any indication as to what sort of alteration might occur. That void only cements what, by this point, should be crystal clear: Barber failed to plausibly allege certainly impending harm.

Because Barber lacks standing, her lawsuit amounts to no more than a request for an advisory opinion. *See Miller v. City of Wickliffe*, 852 F.3d 497, 503 (6th Cir. 2017). We must decline that invitation. *United States v. Fruehauf*, 365 U.S. 146, 157 (1961). One reason why is

that courts that seek to discern the law's meaning without "'that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions" may well commit error in doing so. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (citation omitted); *see also Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 354 (6th Cir. 2007); Felix Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1002, 1005 (1924) ("Facts and facts again are decisive."). Another is that wading prematurely into local disputes offends principles of federalism, which favor affording local officials the opportunity to develop their policies—and thus nip constitutional concerns in the bud, before any infringement on individual rights occurs—without intervention by federal courts. *See Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 958 (6th Cir. 2020) (citing *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 273, 247 (1952)). And yet another is that any relaxation of standing requirements necessarily "alter[s] the allocation of power . . . away from a democratic form of government," *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted), by charting a course for those aggrieved in the political process to "run[] to a sympathetic court for a do-over without any concrete injury to speak of," *Vonderhaar v. Village of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006)).

Nor, for that matter, would enforcing ordinary standing rules cause any harm to Barber. Even following dismissal, she would remain free to seek judicial intervention if her squabble with defendants were to develop into something more than an abstract policy disagreement about the dam's future. Until then, however, federal courts have no place. *See Summers*, 555 U.S. at 493; *Vonderhaar*, 906 F.3d at 401. At day's end, I would affirm the district court's decision to dismiss Barber's case for lack of standing, leaving questions of ripeness for another day.